Michael J. Niborski (State Bar No. 192111)
e-mail: mniborski@pryorcashman.com
**PRYOR CASHMAN LLP**
1801 Century Park East, 24th Floor
Los Angeles, California 90067-2302
Tel:   (310) 556-9608
Fax:   (310) 556-9670

Andrew S. Langsam (admitted *pro hac vice*)
e-mail: alangsam@pryorcashman.com
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036-6569
Tel:   (212) 326-0180
Fax:   (212) 515-6969

*Attorneys for Defendants*
Tennman Productions, LLC; Justin Timberlake;
Spears King Pole, Inc.; and Britney Spears

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARGE AUDIENCE DISPLAY SYSTEMS, LLC,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>TENNMAN PRODUCTIONS, LLC, JUSTIN TIMBERLAKE, BRITNEY TOURING, INC., BRITNEY SPEARS, STEVE DIXON and MUSIC TOUR MANAGEMENT, INC.,<br><br>　　　　　Defendants. | Case No. CV 11-03398 R (RZx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RECOVERY OF ATTORNEYS' FEES, COSTS AND EXPENSES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[*Declaration of Andrew S. Langsam filed concurrently herewith*]<br><br>Hearing:<br>Date: August 3, 2015<br>Time: 10:00 a.m.<br>Place: Courtroom 8<br>　　　　Spring Street Courthouse |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 3, 2015, at 10:00 a.m., or as soon thereafter as this matter may be heard, before the Honorable Manuel Real of the above-entitled court located at 312 N. Spring Street, Los Angeles, California 90012, Courtroom 8, Defendants Tennman Productions, LLC, Justin Timberlake, Spears King Pole, Inc., and Britney Spears (collectively, "Defendants") will and hereby do move this Court an order awarding attorneys' fees, costs, and expenses incurred by Defendants in connection with claims for patent infringement asserted against them by Plaintiff Large Audience Display Systems, LLC ("LADS").  This Motion is made pursuant to Federal Rule of Civil Procedure 54(d), Central District of California Local Civil Rules ("Local Rules") 54-1 et seq., 35 U.S.C. § 285, and 28 U.S.C. § 1920.

This Motion is and will be based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Andrew S. Langsam, the pleadings and papers on file herein, all other matters of which the Court may take judicial notice, and upon such other or further material as may be presented at or before the hearing of this matter.  This Motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on June 23, 2015.

**PRYOR CASHMAN LLP**

Dated: June 30, 2015      By:    */s/ Michael J. Niborski*
                                         Michael J. Niborski
                                         Andrew S. Langsam (admitted *pro hac vice*)

                                         ***Attorneys for Defendants***
                                         Tennman Productions, LLC; Justin Timberlake; Spears King Pole, Inc.; and Britney Spears

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ....................................................... i

TABLE OF AUTHORITIES ................................................................ iii

I.  INTRODUCTION ...................................................................... 1

II.  FACTUAL BACKGROUND OF PLAINTIFF'S MISCONDUCT ............... 1

    A.  Fabricating Jurisdiction and Venue ....................................... 1

    B.  Forum Shopping ............................................................. 3

    C.  Specious Oppositions ....................................................... 4

    D.  Reexamination Impropriety ................................................ 6

        1.  Plaintiff Failed to Act with Good Faith and Candor ................. 6

        2.  Plaintiff Took Ridiculous Positions ................................... 7

        3.  All Plaintiff's Asserted Patent Claims Held Invalid ................. 9

    E.  Final Gasp .................................................................. 10

    F.  Settlement Stonewalling .................................................. 10

    G.  Frivolous Damages ........................................................ 12

    H.  Cumulative Misconduct .................................................. 13

III.  ARGUMENT ...................................................................... 14

    A.  Award of Attorneys' Fees ................................................. 14

        1.  Defendants Are Prevailing Parties ................................... 15

        2.  Attorneys' Fees Are Proper
           Because This Case Is "Exceptional" .................................. 15

    B.  Reasonable Attorneys' Fees .............................................. 16

        1.  Defendants' Attorneys' Fees Are Reasonable and Necessary .. 16

        2.  Defendants Should Be Awarded All Their Attorneys' Fees .... 18

        3.  Calculation of Defendants' Reasonable Attorneys' Fees ........ 18

IV.  CONCLUSION .................................................................... 19

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(s)**

*Aro Mfg. v. Convertible Top Replacement Co.*,
377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) ....................................... 12

*Blum v. Stenson*,
465 U.S. 886, 104 S.Ct. 1541 (1984) ........................................................... 15, 16

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*,
393 F.3d 1378 (Fed. Cir. 2005) ..................................................................... 14

*City of Burlington v. Dague*,
505 U.S. 557, 112 S.Ct. 2638 (1992) ............................................................... 16

*Coupe v. Royer*,
155 U.S. 565, 15 S.Ct. 199, 39 L.Ed.2d 263 (1895) ......................................... 12

*Cunningham v. County of Los Angeles*,
879 F.2d 481 (9th Cir. 1988) .......................................................................... 16

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) ................................... 14

*Kilopass Tech., Inc. v. Sidense Corp.*,
No. 10-cv-02066-SI, 2015 U.S. Dist. LEXIS 30650
(N.D. Cal. Mar. 11, 2015) ........................................................................ 14, 17

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
718 F. Supp. 2d 382 (S.D.N.Y. 2010),
*aff'd*, 435 F. App'x 927 (Fed. Cir. 2011) ....................................................... 10

*Morales v. City of San Rafael*,
96 F.3d 359 (9th Cir. 1996) ........................................................................... 15

*Octane Fitness, L.L.C. v. ICON Health & Fitness, Inc.*,
134 S.Ct. 1749, 188 L.Ed. 2d 816 (2014) ....................................................... 14

iii

**CASES**                                                                      **PAGE(s)**

*Osram Sylvania, Inc. v. American Induction Techs., Inc.*,

    701 F.3d 698 (Fed. Cir. 2012) ........................................................10

*Special Devices, Inc. v. OEA, Inc.*,

    269 F.3d 1340 (Fed. Cir. 2001) ..................................................... 17

*Uniloc USA, Inc. v. Microsoft Corp.*,

    632 F.3d 1292 (Fed. Cir. 2011) ..................................................... 11


**STATUTES**

C.D. Cal. Local Civil Rule 54-1 ..................................................... 14

Fed. R. Evid. 408(a) ..................................................................... 11

35 U.S.C. § 102 ..................................................................... 9, 10

35 U.S.C. § 103 ......................................................................... 10

35 U.S.C. § 284 ................................................................... 12, 13

35 U.S.C. § 285 ........................................................... 13, 14, 17

37 CFR 1.56(a) ............................................................................. 6

37 CFR 1.933(a) ........................................................................... 6


**ARTICLES**

Daniel Nazer & Vera Ranieri, *Why Do Patent Trolls Go to Texas? It's Not for the BBQ*, Electronic Frontier Foundation (July 9, 2014), www.eff.org/deeplinks/2014/07/why-do-patent-trolls-go-texas-its-not-bbq
.............................................................................................. 4

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Tennman Productions, LLC, Justin Timberlake, Spears King Pole, Inc., and Britney Spears (collectively, "Defendants") submit this Memorandum of Points and Authorities in support of their Motion seeking attorneys' fees, costs, and expenses from Plaintiff Large Audience Display Systems, LLC ("LADS" or "Plaintiff") in the above-captioned action.

## I.   INTRODUCTION

This meritless lawsuit has, for close to six years, unnecessarily drained judicial resources and Defendants' finances merely to further Plaintiff's naked grasp for a monetary settlement from Defendants, who are successful and high-profile entertainers.  Plaintiff's consistent and continuous misconduct throughout this dispute, both before this Court and before the U.S. Patent Office, is exceptional in its egregiousness.  Although Defendants have ultimately prevailed as to every single claim of the U.S. patent asserted by Plaintiff against them, Defendants were forced to divert much attention and expend sizable attorneys' fees in the process.  The facts show a clear attempt at a "shakedown" with no real possibility of recovery on the merits and, most importantly, a deliberate manipulation of the judicial system and Plaintiff's access to the same.  As such, and for the reasons set forth in more detail below, Defendants respectfully request that the Court grant their prayer for attorneys' fees, costs, and expenses.

## II.   FACTUAL BACKGROUND OF PLAINTIFF'S MISCONDUCT

### A.   Fabricating Jurisdiction and Venue

Plaintiff commenced this lawsuit based on a lie: the named Plaintiff, LADS, was formed for the sole purpose of fabricating jurisdiction and venue in the Eastern District of Texas ("E.D. Texas").  Darrell Metcalf ("Metcalf"), the sole inventor of

U.S. Patent No. 6,669,346 (the "Patent"),[1] the patent in suit, is and at all times was a California resident.  (Declaration of Andrew S. Langsam filed concurrently herewith ("Langsam Decl."), Ex. A.[2])  LADS, the named Plaintiff, was formed on November 9, 2009, a mere two days before this action was commenced in the E.D. Texas.  (Ex. B, at 2; Dkt. 1.)  Metcalf was LADS's only member of LADS, ever. (Ex. B, at 3.)  Metcalf assigned his interest in the Patent to the LADS entity on October 21, 2009—an impressive 18 days before LADS was even formed. (Ex. C.)  Notably, LADS no longer exists: indeed, it officially forfeited its existence over three years ago, on February 10, 2012, for apparent non-payment of taxes in Texas.[3]  (Ex. B, at 2.)

However, even in 2009 (and before it ceased to exist in 2012), LADS was a sham—formed just to have the case brought and tried in the E.D. Texas, at the convenience of Mr. Metcalf's attorneys.  As set out in great detail in Defendants' Motion to Change Venue, (dkt. 46), LADS never conducted any business whatsoever in Texas (nor California nor anywhere else).[4]  The Texas "office" in which LADS alleged it did business was seemingly never visited by Metcalf, not even to pick up the keys.  (Dkt. 46-6 ¶¶ 3-5.)  Its mail merely accumulated in the

---

[1] The Patent was issued on December 30, 2003, based on an application filed with the U.S. Patent Office on May 15, 2000.  (*See* Ex. A, at 1.)

[2] All exhibit references are to the exhibits attached hereto via the Langsam Declaration.

[3] Indeed, as of June 30, 2015, neither LADS nor Metcalf had timely paid twelfth-year maintenance fees for the Patent, meaning that it has been abandoned (unless a surcharge is paid, in addition to the maintenance fees, to continue the Patent's life).  (Ex. D.)

[4] There is no entity with LADS's name registered in California.  (Ex. E.)  Although LADS does have a website listing a California address for its contact information, *see* http://largeaudiencedisplaysystems.com/ (last visited June 25, 2015), images available via Google's Street View feature suggest that this is a residential address.  *See* https://goo.gl/maps/qAQqB (last visited June 25, 2015).

1   basement of the building where LADS claimed to have its business.  Thus,

2   Plaintiff's statement, in its complaint, that Texas was LADS's "principal place of

3   business" is a bald-faced lie.  (Dkt. 1, at 1.)  Indeed, the only activity that LADS

4   has definitively engaged in has been the frivolous pursuit of this litigation.  The

5   conclusion is inescapable that LADS was a puppet entity created exclusively to

6   dupe the judicial system.

7         In addition, Plaintiff, in seeking to establish personal jurisdiction over

8   Defendants in the E. D. Texas, in its complaint alleged (solely on "information and

9   belief") as "acts of infringement" the mere sales of concert tickets, and in the case

10  of Defendant Timberlake, the sale of concert videotapes, to residents within the

11  E.D. Texas.  (Dkt. 1 ¶¶ 13, 15, 17.)  However, <u>none</u> of the concerts with alleged

12  infringing systems were located in the E. D. Texas.  This attempt to bootstrap

13  jurisdiction based on the sale of tickets and videotapes within the E. D. Texas was

14  another attempted fraud on the courts and upon Defendants.  The bare sale of a

15  ticket or a video showing a machine or device located <u>outside</u> a jurisdiction does

16  <u>not</u> constitute an act of patent infringement of the machine or device <u>within</u> the

17  jurisdiction where the tickets or videos were sold.  Indeed, the only statutorily-

18  specified acts of infringement are the making, using, selling and offering for sale,

19  and/or importing the claimed invention.  35 U.S.C. § 271.  Plaintiff's fictitious

20  basis of personal jurisdiction over Defendants is another reason that this case is

21  exceptional and calls for the award of attorneys' fees and costs.

22        **B.    Forum Shopping**

23        Aside from LADS's dubious genesis, Plaintiff's choice of the E.D. Texas as

24  a forum was further suspect and a clear forum shopping effort in light of the simple

25  fact that none of the parties, witnesses, or evidence were located therein.  Instead,

26  Metcalf as well as all of the Defendants, witnesses, and evidence were primarily

27  located and resided in the Los Angeles area, i.e., in the Central District of

28

California ("C.D. Cal."). The only credible explanation for Plaintiff's choice to originally file this lawsuit in the E.D. Texas is that Plaintiff was forum shopping in hopes of taking advantage of that District's reputation as being patent plaintiff-friendly and to cause great inconvenience to Defendants and the witnesses.[5] This also explains Plaintiff's choice of counsel located in the E.D. Texas, as opposed to a place to which Metcalf actually had ties. Even the chosen "expert" proffered before the U.S. Patent Office by Metcalf in connection with the *inter partes* reexamination of the Patent (discussed below) was a California resident. (*See* Ex. F, at 11.)

There were no ties to Texas except for the residences of the attorneys chosen by Metcalf, apparently on the basis of their location in a district considered favorable to Plaintiff's legal position. Thus, the creation of the entity for holding the Patent, the claim of business in the E.D. Texas, and the choice of Texas as a forum were frauds sought to be perpetrated by Plaintiff. The jurisdiction and venue manipulation forced Defendants to expend attorneys' fees in filing a motion to change venue to the clearly proper venue, as described below. (Dkt. 46.) Defendants' motion was ultimately granted, against the vigorous opposition of Plaintiff and its attorneys. (Dkt. 95.).

## C. Specious Oppositions

Plaintiff's decision to commence this action in a forum that was, in reality, improper, forced Defendants to expend otherwise-unnecessary attorneys' fees in seeking to transfer the case to the clearly proper venue of the C.D. Cal. (*See* dkt. 46.) Plaintiff vigorously opposed Defendants' motion to change venue. (Dkt. 57 (opposition); dkt. 63 (sur-reply).) In doing so, Plaintiff facetiously tried to

---

[5] *See, e.g.*, Daniel Nazer & Vera Ranieri, *Why Do Patent Trolls Go to Texas? It's Not for the BBQ*, Electronic Frontier Foundation (July 9, 2014), https://www.eff.org/deeplinks/2014/07/why-do-patent-trolls-go-texas-its-not-bbq.

1   paint LADS as a plucky Texas start-up company, despite the fact that LADS (as
2   was always clear but is now excruciatingly evident) never conducted business in
3   Texas or anywhere else.  (Dkt. 57, at 1-2.)

4       Ultimately, the presiding judge in the E.D. Texas agreed with Defendants
5   and ordered the transfer of this action to the C.D. Cal. on March 30, 2011.
6   (Dkt. 95.)  To illustrate the weakness of Plaintiff's position on this issue, the ten
7   previous motions to transfer venue brought before the same E.D. Texas court had
8   been denied.  Yet, in this case, the E.D. Texas court recognized that the E.D. Texas
9   was an obviously improper choice of forum and ordered the transfer of the case to
10  the C.D. Cal.  (Dkt. 95.)

11      Just before the formal transfer order was issued, Plaintiff submitted and filed
12  infringement contentions, listing the claims of the Patent that Plaintiff asserted
13  were infringed by Defendants.  (Ex. G.)  Many claims were identified.  Then, once
14  the case had been transferred to C.D. Cal., Plaintiff once again filed its
15  infringement contentions that identified the claims of the Patent that Defendants
16  allegedly infringed.  (Ex. H.)  The claims of the Patent alleged to be infringed in
17  both sets of infringement contentions were identical.  (*Compare* Ex. G *with* Ex. H.)

18      Soon thereafter, Los Angeles Lakers, Inc., previously a co-defendant in this
19  action, requested an *inter partes* reexamination before the U.S. Patent Office of all
20  of the Patent claims that Plaintiff had identified and asserted against Defendants in
21  this action.  (Ex. I.)  Because an *inter partes* reexamination has a preclusive effect,[6]
22  and in light of the relative infancy of the case (the first two years had been spent

23
24  _____
25  [6] If the Patent Office determined the claims to be valid, then Defendants could not re-
    litigate those issues based on any prior art relied on by the Patent Office; if, instead, the
26  Patent Office determined the claims to be <u>invalid</u> because of new prior art brought to its
    attention, then the case would be dismissed with prejudice (the latter is exactly what
27  happened).
28

primarily getting the case before the correct court), Defendants requested a stay of this action while the Patent Office conducted its reexamination of the Patent. (Dkt. 146.)  Plaintiff, once again, vigorously opposed Defendants' motion for a Stay, (dkt. 158), even (unsuccessfully) seeking leave to file a sur-reply.  (Dkt. 163, 166.)  Again, however, the Court once again sided with Defendants and granted their motion for a stay pending the U.S. Patent Office's reexamination of the Patent—but not before Defendants had expended additional attorneys' fees. (Dkt. 183, 184.)

### D.   Reexamination Impropriety

#### 1.   Plaintiff Failed to Act with Good Faith and Candor

Plaintiff continued its misconduct before the U.S. Patent Office during the *inter partes* reexamination.  Specifically, Plaintiff failed to uphold its duty to bring relevant prior art to the Patent Office's attention.  During an *inter partes* reexamination, "the patent owner . . . has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability."  37 CFR 1.933(a).[7]  In or around February 2012, Defendants became aware of additional prior art that was clearly relevant to the reexamination.  Defendants, who were third-party requesters in the reexamination, were unable to present this newly-uncovered prior art to the Patent Office because it was not in the original reexamination request, thus the submission of this new and relevant prior art by Defendants was considered untimely.  (*See* Ex. I.)

Defendants duly informed Plaintiff both of the existence of this prior art and of Plaintiff's duty, as the patent owner, to immediately disclose the same to the

---

[7] This provision is a specific application of the ongoing duty of candor and good faith that all patentees owe in their dealings with the U.S. Patent Office.  *See* 37 CFR 1.56(a).

Patent Office.  (*See* Ex. J, at 4-5.)  However, it was not until September 11, 2012—after the Patent Office issued its then-final determination of the unpatentability of all of the asserted claims of the Patent—that Plaintiff tried to sneak the new prior art into the record to make it appear as though the Patent Office had actually considered it.  The Patent Office, as a direct consequence of the newly-submitted prior art, reopened the reexamination proceedings, causing further attorneys' fees to be expended by Defendants.  LADS's conduct constituted a flagrant dereliction of its duty of candor and good faith, and yet another instance of clear litigation misconduct and gamesmanship that increased Defendants' costs.  (*See* Ex. K, at 4; Ex. J, at 2-3, 4-5.)

### 2.    Plaintiff Took Ridiculous Positions

Moreover, the *inter partes* reexamination ultimately made clear the frivolousness of Plaintiff's position: the Patent Office did not, at any point, adopt a single one of Plaintiff's proffered interpretations for the seven contested terms of the claims.  (Ex. K, at 10-22; Ex. L, at 17-38; Ex. M, at 7-21.)

This is not surprising, given that Plaintiff's suggested term constructions strained common sense.  For example, the term "positioning means" was used in the Patent's claims to refer to the mechanism by which the claimed video system (a circular video display screen) was to be supported.  One embodiment of the invention, shown in the drawings and fully described in the Patent specification, was of the video screen positioned on top of a building.  (Ex. A, at 9 (Fig. 12); *id.* at 13 (description of Fig. 12).)  The Patent expressly describes the building as "the positioning means."  (*Id.* at 13.)  However, in the reexamination (hoping to save its Patent from invalidity in view of prior art), Plaintiff speciously argued that the term "positioning means" necessarily referred to and was a mechanism or "means" that itself was capable of vertically <u>moving</u> the screen to <u>more than one</u> position—despite the fact that it is patently obvious that a building cannot

upwardly move to more than one elevation.  (Ex. N, at 5.)  The U.S. Patent Office saw through Plaintiff's machinations and declined to adopt Plaintiff's ludicrous proposed construction, instead holding (consistently with basic common sense as well as the drawings and detailed description in the Patent) that a "positioning means" must simply be a "means" that "would [allow the screen to] be placed or positioned in some manner at some location."  (Ex. K, at 11; *see also* Ex. L, at 22; Ex. M, at 15-17.)

All of Plaintiff's urged claim term constructions were equally unsupported in reality, and equally unsustained by the U.S. Patent Office.  An additional example of Plaintiff's ridiculous approach to claim construction is found in its strained reading of the term "substantially contiguous" to mean entirely, or seamlessly, contiguous.  (Ex. L, at 34; Ex. M, at 14-15.)  Transparently, to again try to save the Patent's claims from invalidity, Plaintiff argued that "substantially contiguous" necessarily meant wholly continuous and without any gaps.  Once again, the U.S. Patent Office declined to adopt Plaintiff's convoluted construction, instead giving the word "substantially" its common-sense meaning of "for the most part," rather than entirely.  (*Id.*; *see also* Ex. N, at 12-13.)  Even, for example, the term "large audience" was argued by Plaintiff to necessarily refer only to viewing locations with hundreds (rather than dozens) of spectators, and yet an example within the Plaintiff's Patent showed and described the video screen system in an environment of fewer than 20 people.  (Ex. M, at 8-10; *see also* Ex. K, at 11.)

Other examples of Plaintiff's attempted distortions of the English language in an attempt to save its Patent claims from invalidity by promoting claim constructions divorced from the meanings originally given to the words by the written original description of the Patent, are, sadly, repeatedly present in the reexamination proceedings.  The mere fact that Plaintiff took such outlandish

positions, urging claim constructions entirely unmoored from reality, indicates that Plaintiff was unconcerned with acting in good faith.

### 3. All Plaintiff's Asserted Patent Claims Held Invalid

Even more tellingly, the Patent Office consistently, finally, and on appeal rejected each and every one of the Patent claims submitted for reexamination by Defendants, which were all of the Patent claims asserted by Plaintiff against Defendants in Plaintiff's two sets of infringement contentions.[8] (*See* Ex. K; Ex. L; Ex. M.) The Patent Office Examiners' unanimous determination (that every single one of the Patent claims asserted against Defendants was invalid in light of the prior art) was unanimously affirmed by a three-judge panel of the Patent Trial and Appeal Board. (Ex. M, at 3.) The fact that all of Plaintiff's asserted claims were held invalid has been made clear to this Court on numerous occasions, (*see, e.g.*, dkt. 205, 216), and, indeed, formed the basis for the Court's dismissal, with prejudice, of Plaintiff's meritless action. (Dkt. 222.).

Significantly, all of the submitted and reexamined claims were determined as invalid on numerous grounds. First, the claims were held to be anticipated by five discrete prior art references. *See* 35 U.S.C. § 102.[9] (Ex. M, at 4.) Moreover, the claims were held to be obvious in light of a whopping 28 combinations of various prior art references. *See* 35 U.S.C. § 103.[10] (Ex. M, at 4-5.)

---

[8] Plaintiff accused Defendants of infringing Patent claims 1-6, 9, 10, 13-15, 17, 24, and 28. (*See* Ex. G; Ex. H.) To reiterate, the U.S. Patent Office deemed every single one of these claims to be invalid in light of the prior art. Not a single claim asserted by LADS as infringed survived the reexamination.

[9] A patent is invalid as anticipated when a single prior art reference discloses all of the elements of the claimed invention. *See* 35 U.S.C. § 102. Here, the Patent was found to have been anticipated by five different prior art references.

[10] A patent is invalid for obviousness when "a skilled artisan would have been motivated to combine the teaching of the prior art references to achieve the claimed invention."

### E.     Final Gasp

Faced with the, frankly, foreseeable fact that all of its asserted Patent claims had been held invalid, Plaintiff (rather than reasonably accept its well-earned defeat) boldly petitioned this Court to re-open the case so that Plaintiff could leverage costly discovery for a possible settlement and/or fish for evidence to enable it to assert, against Defendants, additional claims that had been in the Patent all along.  (Dkt. 213, 219.)  The Court correctly rejected Plaintiff's ploy, but not before Defendants were forced to expend additional attorneys' fees opposing Plaintiff's motion.

### F.     Settlement Stonewalling

In addition to its atrocious behavior in the proceedings themselves, Plaintiff also refused to engage in any serious settlement negotiations.  First, Plaintiff ominously warned Defendants that the case would be very expensive for Defendants to defend.  (Langsam Decl. ¶ 48.)  This plainly suggests that Plaintiff's strategy was to increase the costs of this litigation to an unacceptable level in an attempt to pressure financially well-heeled Defendants into a settlement despite the obvious lack of merit of any of Plaintiff's Patent claims.

Moreover, Plaintiff stalled providing a settlement demand despite assurances it would do so.  (Langsam Decl. ¶ 43.)  Indeed, Plaintiff refused to even discuss settlement unless and until Defendants first entered into a superfluous confidentiality agreement as to settlement discussions (which are anyway protected under Fed. R. Evid. 408(a)).  (Ex. O; *see also* Langsam Decl. ¶ 44.)  However,

---

*Osram Sylvania, Inc. v. American Induction Techs., Inc.*, 701 F.3d 698, 706 (Fed. Cir. 2012) (emphases added) (citations & quotations omitted).  That is, "[i]f it is necessary to reach beyond the boundaries of a single reference to provide missing disclosure of the claimed invention, the proper ground is not § 102 anticipation, but § 103 obviousness."  *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 718 F. Supp. 2d 382, 416 (S.D.N.Y. 2010), *aff'd*, 435 F. App'x 927 (Fed. Cir. 2011) (citations & quotations omitted).

Defendants, seeking to resolve the matter, executed the confidentiality agreement in reliance of Plaintiff's promise that, once that was accomplished, Plaintiff would immediately provide a settlement demand/offer.  (Ex. P; Langsam Decl. ¶¶ 44-45.)

Instead of making its promised settlement demand, Plaintiff then demanded that Defendants first disclose and then certify the amount of gross revenues for the Defendants' concerts, during which the claimed invention of the Patent was alleged to be used.  (Ex. Q; Langsam Decl. ¶ 46.)  Yet, as was painfully clear, the gross concert revenues for entertainers such as Defendants, had no nexus nor relationship to the supposed use of the overhead video display system which allegedly was employed at the concerts.  To even demand the gross revenues was nonsensical—such gross revenues, unconnected to the Patent, have been determined to be irrelevant.  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-19 (Fed. Cir. 2011) (holding that, because plaintiff failed to show that its patented invention was the basis for consumer demand of defendant's allegedly infringing products, the use of defendant's entire gross revenues was an improper means of calculating damages).

Nevertheless, Defendants, in a good faith attempt to reach a settlement, directed Plaintiff to websites that estimated Defendants' gross revenues.  That was not enough for Plaintiff.  Plaintiff then demanded certification that the estimates, albeit irrelevant to the issue of patent damages, be within 5% of the actual gross revenues.  (Ex. R; Langsam Decl. ¶ 47.)  Defendants refused because Plaintiff's gamesmanship was apparent and, in any case, those gross revenue figures are irrelevant to damages in a patent infringement action, as described below.  Plaintiff's unwillingness to cooperate unless Defendants disclosed highly sensitive yet irrelevant financial information exposes the fact that Plaintiff was never serious about providing an offer for a reasonable settlement but only sought to leverage the

1  potentially embarrassing disclosure of the Defendants' huge incomes for a

2  settlement on its invalid Patent.

3      **G.    Frivolous Damages**

4         In fact, Plaintiff's assertion that its Patent's value was directly related to

5  Defendants' gross receipts connected with their presentation of entertainment

6  concerts is yet another example of Plaintiff's improper conduct in this action.

7         The Patent Act provides that a prevailing patent holder is entitled to

8  "damages adequate to compensate for the infringement."  35 U.S.C. § 284.  The

9  law has long been clear that the measure of a prevailing patentee's recovery is "not

10  what the defendant has gained, but what plaintiff has lost."  *Coupe v. Royer*,

11  155 U.S. 565, 582, 15 S.Ct. 199, 206, 39 L.Ed. 263 (1895).  The "present statutory

12  rule," under § 287, "is that only 'damages' may be recovered"—and "damages"

13  are defined "as 'compensation for the pecuniary loss [the patentee] has suffered

14  <u>from the infringement</u>, without regard to the question whether the defendant has

15  gained or lost by his unlawful acts.'"  *Aro Mfg. Co. v. Convertible Top*

16  *Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964)

17  (emphases added) (quoting *Coupe*, 155 U.S. at 582).  Thus, a prevailing patentee

18  cannot measure <u>its own</u> damages by <u>defendants'</u> receipts or their profits, especially

19  where the receipts are utterly unrelated to the patented device.

20         There must be a nexus between the patented invention and the gross revenue

21  of the concerts, which is not even arguably extant here.  Defendants are high-

22  profile, high-earning musical entertainers.  Plaintiff's Patent relates to a video

23  screen display, primarily utilized for pre-concert advertising and as an introduction

24  to the musical acts, allegedly used at Defendants' concerts.  No spectators

25  reasonably attended the concerts to view the video screens, as they could watch

26  music videos at home if that was their desire.  Because the Patent Act's damages

27  provision aims to compensate wronged patent holders (rather than provide them

28

with an undeserved windfall), Plaintiff's claim for damages based on the concerts' gross receipts was entirely unfounded in the law and therefore frivolous. Moreover, even a reasonable royalty, the other basis for damages for the infringement of a valid patent under 35 U.S.C. § 284, would never be based on the gross receipts of an entity, unconnected to the alleged infringing use of the patented system.

Plaintiff's demands were ill-advised and a clear attempt to embarrass the Defendants, with their wealth and high earnings, in an improper effort to gain highly sensitive financial information hoping that it would result in a settlement.

## H.   Cumulative Misconduct

Plaintiff engaged in litigation misconduct from the earliest genesis of this lawsuit, through the *inter partes* reexamination, and in all of its interstitial assertions and actions.  Plaintiff manufactured venue and jurisdiction, asserted ridiculous definitions of terms of the Patent's claims, failed to act in accordance with its statutory duties, put forth futile arguments and ill-advised oppositions to Defendants' motions, spuriously sought a blatantly improper measure of damages, repeatedly indicated that the cost to defend was going to be hugely more than an amount in settlement, and concomitantly refused to reasonably discuss settlement on the merits.

This case, it is crystal clear, was nothing but an attempt by Plaintiff to shake out a financial settlement from high-income celebrity entertainers, independent of the merits.  Plaintiff should not be permitted to do so without consequence.

1    **III.   ARGUMENT**

2       **A.   Award of Attorneys' Fees**

3           A court may award attorneys' fees to a prevailing party in a patent dispute

4    "in exceptional cases."  35 U.S.C. § 285.  As the U.S. Supreme Court has recently

5    explained, "an 'exceptional' case is simply one that stands out from others."

6    *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756, 188

7    L.Ed.2d 816 (2014).[11]  This determination is to be made by district courts "in the

8    case-by-case exercise of their discretion, considering the totality of the

9    circumstances."  *Id.*  (footnote omitted).  Factors that a district court may consider

10   include (but are not limited to) "'frivolousness, motivation, objective

11   unreasonableness (both in the factual and legal components of the case) and the

12   need in particular circumstances to advance considerations of compensation and

13   deterrence.'"  *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534

14   n.19, 114 S.Ct. 1023, 1033, 127 L.Ed.2d 455 (1994)).  A prevailing party

15   establishes its right for consideration of entitlement to an award of attorneys' fees

16   by a preponderance of the evidence.  *Id.* at 1758.

17           Moreover, where a plaintiff has shown a consistent pattern of outrageous

18   claim language definitions, as here, courts have awarded reasonable attorneys'

19   fees.  *See, e.g.*, *Kilopass Tech., Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2015

20   U.S. Dist. LEXIS 30650, at *22 (N.D. Cal. Mar. 11, 2015) (awarding attorneys'

21   fees against plaintiff who urged frivolous, and ultimately rejected, claim

22   constructions).

23

24

25   ――――――――――――――

26   [11] *Octane* is a departure from the Federal Circuit's earlier "rigid and mechanical formulation" of the test for what constitutes an exceptional case.  *Octane*, 134 S. Ct. at

27   1754 (discussing *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005)).

28

### 1.    Defendants Are Prevailing Parties

As a threshold matter, Defendants are without any question the prevailing parties because they are "the part[ies] in whose favor judgment [was] rendered." Local Rule 54-1.  (*See* dkt. 222.)  Every one of the asserted claims of the Patent sued upon was determined by the U.S. Patent Office to be invalid on a variety of grounds.  Not one single claim asserted as infringed survived.

### 2.    Attorneys' Fees Are Proper Because
### This Case Is "Exceptional"

Defendants, as the prevailing parties, are entitled to attorneys' fees because this is an exceptional case.  Plaintiff has engaged in litigation misconduct and several frivolous litigation tactics, including fabrication of jurisdiction and venue for commencement of the action in E.D. Texas; unsuccessful and disingenuous opposition to a motion to transfer venue to this Court; similarly unsuccessful and disingenuous opposition to Defendants' motion to stay this action pending the reexamination before the U.S. Patent Office; its deceptive behavior during the reexamination before the Patent Office (where Plaintiff did not disclose known relevant prior art in a timely manner and argued for ridiculous claim definitions); and in Plaintiff's fantastical assertions, in an attempt to extort a settlement, that the case would be very expensive for Defendants to defend and that the Patent's value was based on the gross revenues of the Defendants, who are hugely successful entertainers/performers.  Thus, this case is exceptional and demands an award of attorneys' fees.

Because LADS engaged in frivolous litigation as well as unreasonable and serious litigation misconduct, this case constitutes an "exceptional" one and merits the imposition of attorneys' fees, costs, and expenses against Plaintiff in favor of the prevailing Defendants.  Since Plaintiff's misconduct began with the filing of

the lawsuit in a forum-shopped jurisdiction, fees should be calculated from the very inception of this litigation.

**B.      Reasonable Attorneys' Fees**

Reasonable attorney fees are calculated using the "lodestar" method.  *See, e.g.*, *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).  Under this approach, the court calculates a "lodestar" figure by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate."  *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544 (1984) (citation omitted); *see also Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988).  The lodestar figure is presumptively reasonable.  *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 2641 (1992).

Accordingly, so long as the rates charged and hours expended by Defendants' attorneys were reasonable, the Court should award Defendants the full amount of fees they seek.  Moreover, in certain circumstances, a court may also adjust the award upward beyond the lodestar to take into account special factors. *Blum,* 465 U.S. at 897.

**1.      Defendants' Attorneys' Fees Are Reasonable and Necessary**

As a result of Plaintiff's wholly meritless lawsuit, Defendants have, collectively, been forced to expend $733,414.34 in attorneys' fees and $22,511.52 in costs and expenses.  (Ex. S; Ex. T; Ex. U; Ex. V; *see also* Langsam Decl. ¶¶ 26-41.)  According to a 2013 report, the total cost of defending against a patent infringement lawsuit in which less than $1 million is at stake is $970,000.00; for a lawsuit in which $1 million to $10 million is at stake, the total cost rises to $2.1 million.  (Ex. W.)  Defendants seek, in full total, $755,925.86, which is less than the average cost to defend against even the smallest category of patent infringement action.  Additionally, Defendants' attorneys' fees are reasonable in light of the experience and billed hours of the attorneys and other professionals

who worked on this case during its six-year existence.  (*See* Langsam Decl. ¶¶ 34, 38.)

Moreover, Defendants have been required to incur these expenses in defending themselves against Plaintiff's frivolously asserted Patent claims, prevailing on every single claim asserted both before the U.S. Patent Office and in this Court, and prevailing on every single motion.  The reexamination was, by itself, complicated and expensive, with many rounds of argument, re-argument, the closing and re-opening of proceedings due to Plaintiff's gamesmanship with the disclosure of the prior art, Plaintiff's appeal, among others.  In the courts, the case was expensive because of, *inter alia*, Plaintiff's silly opposition to the change of venue motion, its opposition to the motion to stay, and its most recent attempt to re-open the case.  In this litigation, every one of Defendants' substantive motions has been granted, and every one of Plaintiff's denied.

Thus, Defendants are entitled to be made whole for the entirety of the attorneys' fees they have incurred and been forced to pay.  *See Kilopass Tech.*, 2015 U.S. Dist. LEXIS 30650, at *22 (where defendant "found to have engaged in litigation misconduct" and plaintiff "ultimately prevailed on every claim asserted by" defendant, plaintiff "entitled to all reasonable attorneys' fees arising out of the patent-related litigation" so as to "fulfill[] § 285's dual goal of deterrence and restitution").

Further, awarding Defendants their full attorneys' fees and costs will deliver a strong message to Plaintiff (and to other similarly situated litigants and their attorneys that wish to use the judiciary as a forum to extort exorbitant settlements) that abuse of the judicial process will not be tolerated.

**2.      Defendants Should Be Awarded All Their Attorneys' Fees**

"[T]he amount of the attorney fees [awarded] depends on the extent to which the case is exceptional."  *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1344 (Fed. Cir. 2001).  The fact that Plaintiff's litigation conduct has been exceptionally vexatious should be considered, as should the fact that Plaintiff implied that it would intentionally make the case expensive to litigate and defend against, all to increase attorneys' fees to make this case expensive for Defendants to lead to a settlement.  Plaintiff gambled in this lawsuit, hoping that the specter of attorneys' fees to defend would force the Defendants to settle despite the suit's complete lack of merit.  Plaintiff has lost, and Defendants should not bear the costs of Plaintiff's failed gambit.

**3.      Calculation of Defendants' Reasonable Attorneys' Fees**

The attorneys' fees, costs, and expenses billed to and paid by Defendants were reasonable and necessary to defend against Plaintiff's frivolous allegations of patent infringement.  In support of this motion, Defendants attach invoices reflecting six years' worth of work.  (Ex. S; Ex. T; Ex. U; Ex. V; *see also* Langsam Decl. ¶¶ 26-39.)

Pryor Cashman LLP ("Pryor Cashman") represents four Defendants: two individual Defendants and each individual Defendant's associated corporate entity.  Pryor Cashman's work was billed to two client/matter numbers.  One client/matter number is associated with Defendant Justin Timberlake and his related corporate entity, Defendant Tennman Productions, LLC.  (Ex. S; Ex. U.)  The other client/matter number is associated with Defendant Britney Spears and her related corporate entity, Defendant Spears King Pole, Inc.  (Ex. T; Ex. V.)

The attached billing records indicate, on a date-by-date basis, the initials of each legal service provider/timekeeper, the hourly rate sought for that timekeeper, a description of the services performed, the amount of time billed, and the dollar

amount charged for that entry.  (Langsam Decl. ¶ 28.)  In some cases, the time and dollars billed are zero, which reflects the fact that the number of hours actually worked was written off before the bill was provided to the clients.  (*Id.*)  Moreover, courtesy discounts have been periodically applied to each client's invoice; the total amount of the courtesy discount provided was deducted from the total amount billed.  (Langsam Decl. ¶ 33.)  As indicated in the Langsam Declaration, all of these time records were kept on a contemporaneous basis.  (Langsam Decl. ¶ 26.)  All bills have been paid for or are soon to be paid, in the case of most recently billed entries.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court award attorneys' fees, costs, and expenses of <u>$755,925.86</u>, along with any other relief, pre- and/or post- judgment interest, etc. that it deems appropriate, in favor of Defendants and against Plaintiff.

**PRYOR CASHMAN LLP**

Dated: June 30, 2015         By:    */s/ Michael J. Niborski*

Michael J. Niborski
Andrew S. Langsam (admitted *pro hac vice*)

***Attorneys for Defendants***
Tennman Productions, LLC; Justin Timberlake; Spears King Pole, Inc.; and Britney Spears