Michael G. Burk (admitted *pro hac vice*)
burk@burklaw.com
The BURK LAW FIRM, P.C.
248 Addie Roy Road, Suite A-203
Austin, Texas 78746
Phone: (512) 306-9828
Facsimile: (512) 306-9825

[Additional Counsel for Plaintiff Listed on Signature Page]

*Attorneys for Plaintiff Large Audience Display Systems LLC*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LARGE AUDIENCE DISPLAY SYSTEMS LLC | ) ) ) | CASE NO. CV 11-03398 R (RZx) |
| Plaintiff, | ) ) ) | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR RECOVERY OF ATTORNEYS' FEES, COSTS AND EXPENSES** |
| -vs- | ) ) | |
| TENNMAN PRODUCTIONS, LLC, et al. | ) ) | |
| Defendants. | ) ) ) | [*Declaration of Michael Burk filed concurrently herewith*] |
| _____ | ) | Hon. Manuel Real |

i

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................... iv

I.       INTRODUCTION ................................................................................ 1

II.      ARGUMENT ....................................................................................... 2

    A.   This is Not an "Exceptional Case" Under 35 U.S.C. §285 ................. 2

        1.   Legal Standard ............................................................... 2

        2.   A Transfer of Venue Does Not Make a Case Exceptional ......... 5

        3.   LADS Did Not Act Improperly in Settlement Discussions ....... 7

        4.   The Damages Sought by LADS Were Not Frivolous ............... 9

        5.   LADS Did Not Engage in Improper Reexamination Conduct . 13

            a.   Defendants Falsely Allege LADS Engaged in Misconduct ................................................... 13

            b.   No Misconduct by LADS in Citing Prior Art ............... 14

            c.   LADS' Claim Construction Positions Were Not Egregious ................................................... 15

                i.   "Positioning Means" ........................................... 16

                ii.   "Substantially Contiguous" ................................. 17

                iii.   A "Large Audience" ........................................... 18

            d.   Defendants' Arguments Contradict Their Actions ........ 19

            e.   Many of LADS' Claims Were Found to Be Allowable Which Demonstrates that LADS Acted Reasonably ...... 19

            f.   Awarding Attorneys' Fees to Defendants is Improper in View of Defendants' Actions During Reexamination ............................................. 19

        6.   LADS' Motion for Reinstatement ........................................... 20

        7.   LADS' Good-Faith Efforts to Cooperate with Defendants ...... 21

    B.   Counsel for Defendants Admitted that this Case is Not Frivolous ..... 22

1

    C.    Defendants' Claim for Attorneys' Fees is Excessive and

2
        Unreasonable ......................................................................23

3
III.    CONCLUSION .........................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### TABLE OF AUTHORITIES

**CASES**

*Apple Inc. v. Motorola, Inc.,*
    757 F.3d 1286, 1215 (Fed. Cir. 2014) .......................................................10

*Beckman Instruments, Inc. v. LKB Produkter*
    *AB,* 892 F.2d 1547, 1553 (Fed. Cir. 1989)...................................................23

*Cambrian Sci. Corp. v. Cox Commc'ns, Inc.,*
    No. SACV 11-01011 AG, 2015 WL 178417 (C.D. Cal. Jan. 6, 2015).........23

*Computer Software Protection, LLC v. Adobe Systems Incorporated,*
    No. 12-451-SLR, 2015 WL 1517402 (D. Del. March 31, 2015) ...............4, 5

*CreAgri, Inc. v. Pinnaclife, Inc.,*
    No. 11-CV-6635-LHK, 2014 WL 2508386 (N.D. Cal. June 3, 2014) ...........2

*EON Corp. IP Holdings LLC v. Cisco Sys. Inc.,*
    No. 12-CV-01011-JST, 2014 WL 3726170 (N.D. Cal. July 25, 2014) ......2, 6

*Gametek LLC v. Zynga, Inc.,*
    No. CV 13-2546 RS, 2014 WL 4351414,
    (N.D.Cal. September 2, 2014)............................................................2, 3, 6

*Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.,*
    ---F.3d---, 2015 WL 3893711 (Fed. Cir. June 25, 2015) ..............................3

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
    318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) .................................................10

*Homeland Housewares, LLC v. Sorensen Research,*
    581 F. App'x 877, 881 (Fed. Cir. 2014).....................................................25

*Icon Health & Fitness, Inc. v. Octane Fitness, LLC,*
    576 F. App'x 1002, 1005 (Fed. Cir. 2014)...................................................3

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
    No. SACV 0400689MRP VBKX, 2007 WL 6137003

(C.D. Cal. Apr. 16, 2007) .......................................................................23

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,

    19 F.3d 1291, 1305 (9th Cir.1994) .................................................24

*IPVX Patent Holdings, Inc. v. Voxernet LLC*,

    No. 5:13-CV-01708 HRL, 2014 WL 5795545

    (N.D. Cal. Nov. 6, 2014) .................................................................3

*Kilopass Tech. Inc. v. Sidense Corp.*,

    No. C 10-02066 SI, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) .............25

*Kreative Power, LLC v. Monoprice, Inc.*,

    No. 14-CV-02991-SI, 2015 WL 1967289 (N.D. Cal. Apr. 30, 2015) ..2, 3, 23

*Logic Devices, Inc. v. Apple Inc.*,

    2014 WL 6844821 (N.D. Cal. Dec. 4, 2014) ................................................25

*MarcTec, LLC v. Johnson & Johnson*,

    664 F.3d 907, 915-16 (Fed. Cir. 1998) ........................................................3

*Marketquest Grp., Inc. v. BIC Corp.*,

    No. 11-CV-618 BAS JLB, 2015 WL 4064775 (S.D. Cal. July 2, 2015) ........2

*Modine Mfg. Co. v. Allen Group, Inc.*,

    917 F.2d 538, 543 (Fed.Cir.1990) .................................................................3

*MyMedicalRecords, Inc. v. Jardogs, LLC*,

    No. 2:13-CV-03560-ODW, 2015 WL 1781332

    (C.D. Cal. Apr. 20, 2015)..................................................................4

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,

    134 S.Ct. 1749, 1756 (2014) ........................................................2, 3, 4, 6

*Park-In-Theatres, Inc. v. Perkins*,

    190 F.2d 137, 142 (9th Cir. 1951) .................................................................3

*SFA Sys., LLC v. Newegg Inc.*,

    --F.3d--, 2015 WL 4154110 (Fed. Cir. July 10, 2015)...................................2

*Site Update Solutions, LLC v. Accor North America, Inc.,*
   No. 5:11-CV-3306-PSG, 2015 WL 581175
   (N.D. Cal., February 11, 2015) ........................................................4

*Southwall Technologies Inc. v. Cardinal IG Company*
   54 F.3d 1570, 34 U.S.P.Q.2d 1673 (Fed. Cir. 1995)....................16

*TransPerfect Global, Inc. v. MotionPoint Corp.,*
   No. C 10-2590 CW, 2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) .............4

*Van Gerwen v. Guarantee Mut. Life Co.,*
   214 F.3d 1041, 1045 (9th Cir. 2000) .........................................24

1

**<u>STATUTES</u>**

2

35 U.S.C. §285 ......................................................................................2

3

37 CFR 1.948......................................................................................14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Large Audience Display Systems LLC ("LADS") submits this Response in Opposition to Defendants' Motion for Recovery of Attorneys' Fees.

## I.   <u>INTRODUCTION</u>

Defendants claim "LADS engaged in frivolous litigation" [Dkt. 223 at 15:23], never had a "real possibility of recovery on the merits" [*Id.,* at 1:16-17], and sought "Frivolous Damages" [*Id.,* at 12:3]. Yet when one examines the facts and the prior findings in this case, Defendants' assertions of frivolousness and improper conduct are shown to be false. Defendants apparently hope that because the reexamination was conducted by the PTO, and because all significant matters except for the *sua sponte* lifting of the stay and dismissal of this case were decided either by the Eastern District of Texas ("EDTX"), or, after transfer, by Judge Matz, that the Court will accept Defendants' baseless assertions at face value and will not look into the substance of their arguments and the prior findings by this Court, the EDTX, and the PTO.

LADS urges the Court to carefully review all prior findings by this Court, the EDTX, and the PTO. It will find that at no time has this Court, the EDTX or the PTO found that LADS acted improperly. What it will find is that it was Defendants that failed to obey PTO rules during the reexamination and that the PTO even went so far as to expunge papers that Defendants submitted in violation of the rules.

It will further find that Defendants' Motion is baseless and that despite Defendants' allegations of frivolousness in their Motion, counsel for Defendants previously admitted that LADS' claims were not frivolous.

This is not an "exceptional case" that warrants fee-shifting, and LADS' claims were not frivolous. Defendants' Motion should therefore be denied.

## II.    ARGUMENT

### A.    This is Not an "Exceptional Case" Under 35 U.S.C. §285

#### 1.    Legal Standard

Defendants rely upon 35 U.S.C. §285 which permits recovery of attorneys' fees only in "exceptional cases."   Defendants assert that *Octane Fitness* defined an exceptional case as "simply one that stands out from others" [Dkt. 223 at 14:4-5]. Defendants however failed to set forth the complete *Octane Fitness* standard which defines an exceptional case as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 134 S.Ct. 1749, 1756 (2014).

An exceptional case is "uncommon," "rare," or "not ordinary," and a court may consider such factors as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.*

The Federal Circuit in applying *Octane Fitness* held that "evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits for attorneys' fees purposes." *SFA Sys., LLC v. Newegg Inc.,* --F.3d--, 2015 WL 4154110, *4 (Fed. Cir. July 10, 2015).  Further, courts in applying *Octane Fitness* look to their prior findings (as well as those of any transferring courts) in determining whether the record demonstrates that the case is exceptional.[1]   The decision to award

---

[1] *See, e.g., Gametek LLC v. Zynga, Inc.,* No. CV 13-2546 RS, 2014 WL 4351414, *4 (N.D.Cal. September 2, 2014)(where misconduct alleged prior to transfer, transferee court found no misconduct where transferor court made no finding on issue); *CreAgri, Inc. v. Pinnaclife, Inc.,* No. 11-CV-6635-LHK, 2014 WL 2508386, at *13 (N.D. Cal. June 3, 2014)(court looked to its prior orders and the record in determining whether case was exceptional); *EON Corp. IP Holdings LLC v. Cisco Sys. Inc.,* No. 12-CV-01011-JST, 2014 WL 3726170, at *5 (N.D. Cal. July 25, 2014)(same); *Kreative Power, LLC v. Monoprice, Inc.,* No. 14-CV-02991-SI, 2015 WL 1967289, at *6 (N.D. Cal. Apr. 30, 2015)(same); *Marketquest Grp., Inc. v. BIC Corp.,* No. 11-CV-618 BAS JLB, 2015 WL 4064775, at *2 (S.D. Cal. July 2, 2015)(same).

2

1   fees is committed to the discretion of the district court <u>and even in cases that are found</u>

2   <u>to be "exceptional" the district court still retains the discretion to deny the award.</u>[2]

3        "Fee awards are not to be used 'as a penalty for failure to win a patent

4   infringement suit.'" *Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.,* ---

5   F.3d---, 2015 WL 3893711, *3 (Fed. Cir. June 25, 2015), *quoting Park-In-Theatres,*

6   *Inc. v. Perkins,* 190 F.2d 137, 142 (9th Cir. 1951).  Nor are attorneys' fees to be

7   awarded "solely because one party's position did not prevail." *Id.*

8        As the Northern District of California ("NDCA") has observed, post-*Octane*

9   *Fitness* decisions awarding fees focus on "egregious" behavior.  *Gametek*

10  *LLC v. Zynga, Inc.,* No. CV 13-2546 RS, 2014 WL 4351414, *3 (N.D. Cal. September

11  2, 2014).  In *Gametek* the NDCA rejected the defendant's claim for attorneys' fees and

12  found that while the plaintiff's litigation strategy was "aggressive," it fell short of the

13  kind of <u>egregious</u> conduct found to justify fee shifting post-*Octane Fitness*.  *Id.*, at *3.

14       The defendant in *Gametek* also argued that the plaintiff engaged in misconduct

15  by violating the joinder statute with the filing of its original complaint in the Southern

16  District of California ("SDCA") before transfer to the NDCA.  *Id.,* at *4.  <u>The NDCA</u>

17  <u>rejected that argument because the SDCA never held that joinder was improper</u>.  *Id.*

18       Other California district court opinions make clear that the burden of proving a

19  case to be "exceptional" is high.  In *Kreative* the NDCA applied *Octane Fitness* and

20  found that the fact that the plaintiff's claim constructions and theories were weak did

21  not render them objectively unreasonable.  *Kreative Power, LLC v. Monoprice, Inc.,*

---

[2] *See Icon Health & Fitness, Inc. v. Octane Fitness, LLC,* 576 F. App'x 1002, 1005 (Fed. Cir. 2014) (on remand, stating that Supreme Court's holding in *Octane Fitness* did not revoke discretion of a district court to deny fee awards even in exceptional cases); *see also Kreative Power, LLC v. Monoprice, Inc.,* No. 14-CV-02991-SI, 2015 WL 1967289, at *4 (N.D. Cal. Apr. 30, 2015)(stating that if case is found to be exceptional, the court "must then determine whether an award of attorneys' fees is justified"), *citing MarcTec, LLC v.* Johnson & Johnson, 664 F.3d 907, 915-16 (Fed. Cir. 1998); *IPVX Patent Holdings, Inc. v. Voxernet LLC,* No. 5:13-CV-01708 HRL, 2014 WL 5795545, at *7 (N.D. Cal. Nov. 6, 2014)(stating that "even an exceptional case does not require in all circumstances the award of attorneys' fees"), *quoting Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed.Cir.1990).

No. 14-CV-02991-SI, 2015 WL 1967289, *5 (N.D. Cal., April 30, 2015).

This Court held in *MyMedicalRecords* that under *Octane Fitness* even a finding that the plaintiff engaged in sanctionable conduct was not sufficient to cause the case to rise to the level of an "exceptional case." *MyMedicalRecords, Inc. v. Jardogs, LLC*, No. 2:13-CV-03560-ODW, 2015 WL 1781332, at *3 (C.D. Cal. Apr. 20, 2015).

The NDCA in *Transperfect* denied the motion for attorneys' fees after applying *Octane Fitness* even though it found that the party against whom fees were sought made frivolous arguments, filed frivolous motions, engaged in discovery abuses, and made misstatements of fact at trial. *TransPerfect Global, Inc. v. MotionPoint Corp.*, No. C 10-2590 CW, 2014 WL 6068384, at *8 (N.D. Cal. Nov. 13, 2014).

In *Site Update Solutions*, suit was filed in the Eastern District of Texas ("EDTX"), which then transferred it to the NDCA. *Site Update Solutions, LLC v. Accor North America, Inc.,* No. 5:11-CV-3306-PSG, 2015 WL 581175, at *2 (N.D. Cal., February 11, 2015). After the case was terminated, one defendant sought attorneys' fees based on eight alleged wrongful acts, including the plaintiff's submission of deficient proposed claims constructions to the EDTX that the EDTX found to be "highly problematic." *Id.,* at *4. The NDCA in that case also noted that an earlier order observed that the plaintiff's settlement behavior "raises some eyebrows." *Id.,* at *13. The NDCA however found that these prior findings were not sufficient to render the case "exceptional," and that unlike in cases where frivolous suits were filed in order to extort settlement fees, the plaintiff's litigating position "was not entirely frivolous or objectively unreasonable." *Id.,* at *4, 13. The court also rejected all of the movants' other bases in finding that the failed and flawed arguments put forth by the plaintiff throughout the case did not render the case "exceptional." *Id.,* at *4-15.

In *Computer Software* the court held that "in a case where settlements were reached with other parties, and the court did not construe the claims, or resolve multiple discovery disputes, or resolve motions to dismiss or for summary judgment, to

1    characterize these circumstances as exceptional is <u>exceptionally presumptuous</u>, as well

2    as <u>inconsistent with the court's understanding of what justifies the fee-shifting</u>

3    <u>provisions of § 285</u>" [emphasis supplied].  *Computer Software Protection, LLC v.*

4    *Adobe Systems Incorporated,* No. 12-451-SLR, 2015 WL 1517402, *2 (D. Del. March

5    31, 2015).

6        Similar to *Computer Software*, here a settlement was reached with former

7    Defendant The Los Angeles Lakers, Inc. [Decl. of Michael Burk at ¶3], which was

8    then dismissed from this suit [Dkt. 186].  Apart from the stay entered on May 29, 2012

9    [Dkt. 183], and the *sua sponte* dismissal on June 16, 2015 following the reexamination

10   [Dkt. 222], this Court has not made any substantive rulings in this case, nor has it

11   decided any discovery disputes, and the only motions of any substance that the EDTX

12   decided on the merits were Plaintiff's Motion for Leave to File First Amended

13   Complaint and Join Defendants Steve Dixon and Music Tour Management, Inc. as

14   Additional Defendants [Dkt. 55, 68] (granted in favor of LADS), and Defendants'

15   Motion to Transfer Venue [Dkt. 46, 95] (granted in favor of Defendants).  There has

16   been no finding by this Court, the EDTX or the PTO that LADS acted improperly.

17        **2.    A Transfer of Venue Does Not Make a Case Exceptional**

18        Defendants allege LADS improperly filed suit in the EDTX [Dkt. 223 at pp. 1-5]

19   and sought a "fictitious basis of personal jurisdiction over Defendants" [*Id.,* at 3:19-

20   20].  Yet Defendants sought and obtained transfer from the EDTX <u>only</u> on the basis of

21   <u>convenience</u> [Dkt. 46].  Defendants <u>never</u> requested dismissal or transfer for <u>lack of</u>

22   <u>personal jurisdiction</u> and the EDTX made no findings on that issue [Dkt. 46, 95].  It is

23   disingenuous of Defendants to now claim the EDTX lacked personal jurisdiction and

24   that LADS "attempted fraud" by alleging it did [Dkt. 223 at 3:12-14].

25        There is nothing in the EDTX's transfer order suggesting it found that LADS

26   acted improperly by filing suit there [Dkt. 95].  Whenever allegations of misconduct in

27   another court are made in a claim for attorneys' fees, the court should look to the

28

1  findings of the prior court where the alleged misconduct is said to have occurred.  *See,*

2  *e.g., Gametek,* 2014 WL 4351414, at *4.

3       Further, several cases decided under *Octane Fitness* were filed in the EDTX

4  before being transferred to California, and in those cases the transfer of venue was not

5  used as a basis for determining whether the case was exceptional.[3]

6       Defendants falsely assert in seeking to provide illusory support for their

7  argument that "all of the Defendants, witnesses, and evidence were primarily located

8  and resided in the Los Angeles area" [Dkt. 223 at 3: 26-27].  Yet the evidence shows

9  that Defendant Steve Dixon resided in Texas, and his company Defendant Music Tour

10  Management, Inc. ("MTM") had its principal place of business in Texas [Dkt. 57-4 at

11  ¶6 and Exh. C; Dkt. 83-2 at ¶¶8-11 and Exh.'s F, G, H & I].  Although Defendants

12  argued Dixon resided in California, the evidence was contradictory at best and at one

13  point Dixon even claimed to be operating MTM out of Connecticut [Dkt. 46-8 at ¶4].[4]

14       Another factor in favor of venue in the EDTX was its central geographical

15  location.  In addition to the evidence cited above, other evidence showed Defendants

16  were located throughout the United States, including Louisiana, Tennessee, New York

17  and Delaware [Dkt. 57-4 at ¶¶4-5 and Exh.'s A & B], and that witnesses and evidence

18  were located throughout the world, including England, Canada, Belgium, and Las

19  Vegas [Dkt. 46-8 at ¶¶6, 8, 9 & 12], flatly refuting Defendants' representation to this

20
21  [3] *See, e.g., Site Update Solutions, LLC,* 2015 WL 581175 at *2 (motion for attorneys' fees denied under *Octane Fitness* standard in case transferred from the EDTX to the NDCA); *EON Corp.IP*
22  *Holdings LLC v. Cisco Sys. Inc.,* No. 12-CV-01011-JST, 2014 WL 3726170, at *2 (N.D. Cal. July 25, 2014)(same).

23
24  [4] In an affidavit signed by Defendant Dixon <u>on March 11, 2010</u> that Defendants filed with the EDTX, Dixon testified that he had an "investment property which [he] visited from time to time at 2186 N.
25  Starr Road, Palm Springs, California 92262" [Dkt. 46-8 at ¶2].  However, in a subsequent declaration that he signed on September 30, 2010, Defendant Dixon claimed to currently reside at that California property, that he "became a California resident <u>in early 2010</u>," and that <u>prior to early 2010</u> the
26  California property was "an investment property that [Dixon] visited from time to time" [emphasis supplied][Dkt. 78-1 at ¶3].  Yet in that same declaration, Defendant Dixon inconsistently testified that
27  beginning in <u>June of 2010</u> he leased office space in Milford, Connecticut "<u>which is where I operate</u>
28  <u>MTM and my other business interests</u> when I am not traveling" [emphasis supplied][Id., at ¶4].

1   Court that "all of the Defendants, witnesses, and evidence were primarily located and

2   resided in the Los Angeles area" [emphasis supplied] [Dkt. 223 at 3: 26-27].

3       Defendants then falsely claim that "LADS no longer exists" and that it "ceased

4   to exist in 2012" [*Id.,* at 2:8-11]. LADS still exists and it has existed continuously

5   since the date it was formed. While the Texas Secretary of State did temporarily

6   terminate LADS' certificate of registration due to an oversight in filing the appropriate

7   form demonstrating no state taxes were owed, this did not dissolve LADS and LADS

8   has continued to exist continuously since its formation in 2009. The Texas Secretary

9   of State has now reinstated LADS' registration [Decl. of Michael Burk at Exh. 1].

10      Defendants also falsely assert that LADS' patent "has been abandoned" due to

11   an alleged failure to pay 12th-year maintenance fees [Dkt. 223 at p.2, FN 3]. Contrary

12   to Defendants' demonstrably false statement, the patent was not abandoned and LADS

13   has until December 30, 2015 to pay these fees [Decl. of Michael Burk at ¶7 & Exh. 2].

14      Defendants then refer to LADS as a "puppet entity" [Dkt. 223 at 3: 5]. There is

15   nothing improper about creating an entity in the state of one's choosing. Darrell

16   Metcalf, the Managing Member of LADS, was advised by Texas-based counsel on this

17   and other patents for years prior to the filing of this lawsuit in 2009 [Dkt. 57-2 at ¶4].

18   LADS chose to file suit in a forum convenient to LADS (which was centrally located

19   with respect to the parties, witnesses and evidence), and the EDTX's granting of

20   Defendants' motion to transfer venue on the basis of convenience does not constitute a

21   finding that LADS acted improperly by filing suit in the EDTX.

22           **3.**     **LADS Did Not Act Improperly in Settlement Discussions**

23      Defendants falsely allege that "Plaintiff also refused to engage in any serious

24   settlement negotiations" [Dkt. 223 at 10:11-12]. This assertion is refuted by the fact

25   that LADS entered into a mutual, confidential settlement agreement with former

26   defendant The Los Angeles Lakers, Inc. [Dkt. 188-1; Decl. of Michael Burk at ¶3].

27

28

1        Evidence in Defendants' Motion demonstrates LADS engaged in settlement

2    discussions with Defendants.  However, in attaching that evidence and commenting on

3    these settlement discussions, the Spears Defendants and their counsel violated the

4    "Settlement Discussion Agreement" to refrain from commenting to the Court on

5    settlement discussions.  Defendants acknowledge the existence of this agreement [Dkt.

6    223 at 10:19-22], which requires that settlement discussions "cannot be directly or

7    indirectly mentioned, offered as evidence or used by any party in any Court

8    proceeding," and that "the conduct and demeanor of the parties and their counsel

9    during the settlement discussions are confidential and may never be mentioned or

10   disclosed to anyone, including any Court," and that "no statement will be made to the

11   Court concerning the settlement discussions other than 'we were unable to resolve the

12   dispute'" [emphasis supplied][Decl. of Michael Burk at Exh. 3 at ¶1].

13       By commenting on settlement discussions [Dkt. 223 at pp. 10-12], filing emails

14   reflecting these discussions [Dkt. 224 at Exh. O-R], and making sworn statements

15   concerning these discussions [*Id.,* at ¶¶43-48], the Spears Defendants and their counsel

16   violated the Settlement Discussion Agreement and these discussions cannot be used as

17   a basis for determining whether this case is "exceptional."

18       Even if these discussions could be considered, Defendants' argument is absurd.

19   Defendants complain about LADS informally requesting information about gross

20   revenues from the Spears tour in question, which they claim is "highly sensitive" [Dkt.

21   223 at pp. 10-11], yet they then contradict themselves and assert this "highly sensitive"

22   information was available online and that they directed LADS to that publicly-

23   available information [*Id.,* at 11:17-23].  Defendants also argue that this information

24   was not relevant [*Id.,* at 11:7-16].  Yet Defendants never filed any motion attacking

25   any of the damages sought by LADS or seeking protection from any request by LADS

26   concerning the gross revenues from the tours in question, and there was never any

27   finding by the Court that LADS was not entitled to that information.

28

1   Further proof of the falsity of Defendants' assertion that LADS "stonewalled"

2   settlement discussions is the fact that Defendants requested and LADS consented to

3   multiple extensions of time for Defendants to file their original answer [Dkt. 12, 20,

4   29].  The answers for Defendants Tennman Productions, LLC and Britney Touring,

5   Inc.[5] were originally due on December 16, 2009, but LADS agreed to allow

6   Defendants to have until March 12, 2010 (nearly three months later), to file answers

7   [*Id.*].  Counsel for LADS even filed the motions for these extensions for Defendants

8   [*Id.*].  LADS did these things in order to engage in settlement discussions [Decl. of

9   Michael Burk at ¶5].  Why would LADS agree to postpone Defendants' answer

10  deadline by three months if it was attempting to "stonewall" settlement discussions?

11  As shown above, Defendants' representations that LADS engaged in improper

12  conduct during settlement discussions are false, and the Settlement Discussion

13  Agreement precludes any consideration of settlement discussion conduct in any event.

### 4.   The Damages Sought by LADS Were Not Frivolous

15  Defendants next falsely allege that LADS sought "Frivolous Damages" [Dkt.

16  223 at 12: 3], and assert that "a prevailing patentee cannot measure <u>its own</u> damages by

17  <u>defendants'</u> receipts or their profits, especially where the receipts are utterly unrelated

18  to the patented device" [*Id., at 12:17-19*].

19  LADS <u>never</u> sought to recover all of Defendants' receipts or profits as damages

20  in this case as Defendants falsely suggest.  Rather, LADS sought, as expressly set forth

21  in its Complaint, "such damages as Plaintiff has sustained in consequence of

22  Defendants' infringement of the Patent," a "reasonable royalty," and/or "Defendants'

23  respective gains, profits and advantages <u>derived from the infringement of the Patent</u> or

24  such damages as to the Court shall appear proper within the patent laws" [emphasis

25  supplied][Dkt. 176 at 11: 4-12].  These were not frivolous requests for damages, the

26  Court never made any finding of such, and Defendants never filed a motion for

27

28

---

[5] Britney Touring, Inc. was the predecessor of Spears King Pole, Inc. in this suit and Spears King Pole, Inc. is bound by all agreements previously made by Britney Touring, Inc. [Dkt. 173 at p. 4, ¶4]).

9

1    summary judgment or other motion attacking any of LADS' claims for damages.

2          Defendants further argue that "Plaintiff's assertion that its Patent's value was

3    directly related to Defendants' gross receipts connected with their presentation of

4    entertainment concerns is yet another example of Plaintiff's improper conduct in this

5    action" [Dkt. 223, at 12: 4-6].  Defendants fail to cite to any part of LADS' Complaint

6    where they allege this assertion was made, and Defendants' representation that the

7    gross revenues from the tours using the display devices were irrelevant is false.  LADS

8    sought a reasonable royalty as damages [Dkt. 176 at 11:7-8], and Defendants' gross

9    receipts from the tours in question were relevant to determining a reasonable royalty

10   under the *Georgia-Pacific* factors.[6]

11         Defendants, in attempting to downplay the critical importance of the large

12   audience display devices to their concert performances and revenues therefrom, falsely

13   represent that these devices were "primarily utilized for pre-concert advertising and as

14   an introduction to the musical acts," and that "[n]o spectators reasonably attended the

15   concerts to view the video screens, as they could watch music videos at home if that

16   was desire" [Dkt. 223 at 12:23-26].  Yet a performance video from the tour put on by

17   the Timberlake Defendants shows that the display was an integral aspect of the show,

18   and that it was not merely used for "pre-concert advertising and as an introduction to

19   the musical acts," as Defendants falsely represent [Decl. of Michael Burk at Exh. 4].

20         A live-performance photograph taken from the audience during a performance

21   shows that Mr. Timberlake was not even visible from that vantage point except for the

22

23   [6] In the seminal *Georgia-Pacific* case the court enumerated 15 non-exclusive factors to consider in
     determining a reasonable royalty.  *Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116,
24   1120 (S.D.N.Y. 1970).  Defendants' revenues from the tours in question (whether standing alone or
     considered with other relevant financial information) pertained to several *Georgia-Pacific* factors,
25   including No.'s 8, 10 and 11, which concern the profitability of the product, its commercial success,
     the benefits to those that used the invention, and the value of that use. *Id.* Further, the fact that one
26   reasonable royalty estimation method may more accurately value an aspect of a reasonable royalty
     calculation does not make other approaches inadmissible.  *Apple Inc. v. Motorola, Inc.,* 757 F.3d
27   1286, 1215 (Fed. Cir. 2014).

28
                                                        10

1  projection of his image onto the display device [*Id.,* at Exh. 5].  Other photographs also

2  show the alleged infringing display device being prominently used during the

3  performance which greatly enhanced the concert experience and allowed additional

4  tickets to be sold for these performances [*Id.,* at Exh. 6].

5       The stage used by the Timberlake Defendants was circular [*Id.,* at Exh. 7].

6  Through using the display device in question the Timberlake Defendants were able to

7  seat the audience throughout the entire arena around the circular stage [*Id.*].  Use of the

8  display device in question thereby increased gross tour revenues because it allowed

9  them to sell more tickets utilizing all areas of the arena.  Written reviews confirm the

10  critical importance of the display in the performances:

11      (a)   "At regular interludes, curved transparent screens drop down from above,

12            folding in on the space like a cocoon. This is where some stunningly

13            designed video images will flicker, where ghostly apparitions of choir

14            singers will appear, and - regardless of your position - the place you are

15            most likely to see Justin himself" [*Id.,* at Exh. 8].

16      (b)   "Transparent screens surround the circular stage, projecting the action all

17            the way to the cheap seats" [*Id.,* at Exh. 9].

18      (c)   "The staging of the performance was polished with massive translucent

19            projector screens giving the audience an intimate view of their pop idol"

20            [*Id.,* at Exh. 10].

21

22      (d)   "The round stage, structured to sit in the middle of the arena with fans on

23            all sides, only served to further the dynamism of the performance . . . .

24            Additionally, close-up videos of Justin were projected onto a series of

25            mobile, translucent white screens that constantly rose and fell, allowing

26            one to theoretically watch Justin's actual body and his enlarged face

27            simultaneously" [*Id.,* at Exh. 11].

28

(e)     It's a big show, an in-the-round staging that is choreographed within an inch of its existence . . . . The large-scale, layered images, projected onto transparent curtains, have an eerie, spectral feeling.  Enormous close-ups of Timberlake are altered by layers of color and animation, creating big, ghostly images; combined with the fast-paced cueing of many numbers, the video images add an hallucinatory quality to the show . . . . The video is a key component in the show's overall effect, which combines different levels of spectacle and intimacy at different times [*Id.,* at Exh. 12].

Likewise, the stage used by the Spears Defendants was also circular and it is apparent from images they produced in this case that the display device was an integral aspect of their performances [*Id.,* at Exh. 13].

Defendants' representations that the display devices were not used during the performances and were completely insignificant to the concert experience of the audience or their gross tour revenues are therefore false.  Further, no determination was ever made by the Court on this issue.

Defendants then allege it would be improper for LADS to suggest that gross concert revenues might be relevant to calculating damages because it would be "a clear attempt to embarrass the Defendants, with their wealth and high earnings, in an improper effort to gain highly sensitive financial information hoping that it would result in a settlement" [Dkt. 223 at 13:7-9].  This is an absurd argument.

First, why would Defendants be "embarrassed" about their claimed "wealth and high earnings," and how would information about the gross revenues from the tours using the display devices in question disclose their personal "wealth and high earnings?"  Second, Defendants previously represented to LADS that these gross revenues (which Defendants now allege to be "highly sensitive") were already publicly available online [Dkt. 224 at p. 11, ¶47], so how "sensitive" could this information have been?  Third, the fact that Defendants in their publicly-filed and unsealed Motion

12

openly refer to their "wealth and high earnings" [*Id.,* at 13:7-9], to being "financially well-heeled" [*Id.,* at 10:16], to their "huge incomes" [*Id.,* at 12:1], to being "high-income celebrity entertainers" [*Id.,* at 13: 21], and to being "hugely successful entertainers/performers" [*Id.,* at 15: 20-21], proves that Defendants are not in the slightest bit embarrassed about the wealth they openly profess to have in their Motion. <u>Fourth</u>, Defendants' lawyers in seeking to capitalize on the celebrity of their clients have publicized this case on their firm website and invited the general public to review the order of dismissal thus increasing the likelihood that the general public will obtain other filed documents in this case, such as Defendants' Motion which openly discusses Defendants' "wealth and high earnings" [Decl. of Michael Burk at Exh. 14].

Yet Defendants would have this Court believe that informally requesting during settlement discussions information about the amount of gross revenues from individual tours which used the display devices in question (<u>with a confidentiality agreement in place</u>) is somehow so egregious as to render this case "exceptional."

Defendants' allegations that LADS somehow sought "Frivolous Damages" and improperly sought information to embarrass Defendants are baseless and offer no support whatsoever to their contention that this case is somehow "exceptional."

### 5.    LADS Did Not Engage in Improper Reexamination Conduct

a.    <u>Defendants Falsely Allege LADS Engaged in Misconduct</u>

Defendants falsely assert that LADS engaged in improper conduct during the patent reexamination [Dkt. 223 at pp. 6-9] even though there was no inequitable conduct in the reexamination, and even though it was Defendants, and not LADS, that violated PTO rules during the reexamination.

First, it is important to understand that Defendants cannot be properly referred to as the prevailing party in the reexamination.  While it is true that the 14 original claims asserted in this litigation were invalidated in the reexamination, it is also true that LADS presented another 16 claims that were found to be patentable [Decl. of Michael

Burk at Exh. 15, at Claims 31-46].  As a result, LADS now has a patent with more claims than it had before the reexamination began.  Additionally, Defendants (and third parties) are foreclosed from practicing the inventions set forth in these claims, and the claims that survived the reexamination are stronger than the original claims because more prior art was asserted against them.

Second, <u>it was Defendants, and not LADS, that were repeatedly admonished by the PTO for violating Patent Office rules, and Defendants even had the extraordinary punishment of having filings expunged from the record by the PTO because of violations of PTO rules</u>.  For example, in the Notice of Defective Paper dated March 15, 2013, the PTO admonished Defendants for violating reexamination rules in Parts III(A), (B), (D), (E), and IV(A) and (B) of Defendants' Comments [Decl. of Michael Burk at Exh. 16].  Defendants' violations of PTO rules were so bad that the PTO stated: "Since the third party response filed February 27, 2013 contains at least the noted improper comments and evidence, the entire response will be <u>expunged</u> from the record" [emphasis supplied][*Id.,* at p. 4].  It is quite extraordinary and rare for the PTO to expunge any response due to such a long list of comprehensive violations of rules.

b.   <u>No Misconduct by LADS in Citing Prior Art</u>

Defendants falsely assert that they were "unable to present" certain prior art to the PTO, and that LADS failed to disclose this prior art to the PTO [Dkt. 223 at pp. 6-7].  In fact, Defendants were permitted by PTO procedures to present this prior art, but Defendants (working jointly with and through former Defendant The Los Angeles Lakers, Inc. [*see* Dkt. 224-21 at, *e.g.,* pp. 677-80, 682-87]), failed to follow PTO rules.  Specifically, 37 CFR 1.948 governs the submission of prior art by third-party requestors.  37 CFR 1.948(a)(3) allows third-party requestors to cite additional prior art as part of a comments submission if they provide a statement as to when the prior art first became known or available to them and includes a discussion of the pertinence of

14

each reference to the patentability of at least one claim.[7]

Defendants therefore falsely represented to this Court that they could not submit prior art to the PTO.  Defendants (through the Lakers) actually did submit the prior art at issue to the PTO in an Information Disclosure Statement (IDS) on April 17, 2012 [Decl. of Michael Burk at Exh. 17].   However, because they did not follow PTO rules, the IDS was not entered [Decl. of Michael Burk at Exh. 15].  They then failed to refile the IDS even though they could have done so if they followed 37 CFR 1.948, which only required an amendment of their description of the prior art by removing their improper arguments from the discussion of the pertinence of each reference.

In sum, Defendants (working with and through former Defendant The Los Angeles Lakers, Inc.) violated PTO rules by submitting an IDS that violated 37 CFR 1.948.  Defendants never re-submitted the IDS.  Instead, it was LADS that resubmitted the prior art set forth in the IDS, not Defendants, and all of the prior art was considered by the PTO due to LADS' actions, not Defendants.  Moreover, it was Defendants, not LADS, that submitted papers that so egregiously violated PTO rules that the papers were expunged.  If anyone has committed a "flagrant dereliction of its duty of candor and good faith," it is Defendants, and not LADS.

            c.     LADS' Claim Construction Positions Were Not Egregious

Contrary to Defendants' assertions, LADS's positions on claim terms, etc., were reasonable arguments.  In fact, the PTO, while disagreeing with LADS, never took the position that LADS' positions were wrongly asserted, frivolous or egregious.

---

[7] § 1.948. Limitations on submission of prior art by third party requester following the order for *inter partes* reexamination.  (a) After the *inter partes* reexamination order, the third party requester may only cite additional prior art as defined under § 1.501 if it is filed as part of a comments submission under § 1.947 or §1.951(b) and is limited to prior art: (3) which for the first time became known or available to the third party requester after the filing of the request for *inter partes* reexamination proceeding. Prior art submitted under paragraph (a)(3) of this section must be accompanied by a statement as to when the prior art first became known or available to the third party requester and must include a discussion of the pertinence of each reference to the patentability of at least one claim.

i.      *"Positioning Means"*

LADS' positions regarding the term "positioning means" were not "ludicrous," as Defendants' falsely suggest [Dkt. 223 at 7:19- 8:7].  In fact, the original Examiner of the patent agreed with LADS' positions.  Specifically, one of the references cited against the LADS' claims during the <u>initial</u> prosecution of LADS's Patent and the reexamination of LADS's Patent, is U.S. Patent No. 6,280,341 to Hayashi ("Hayashi"). During the initial prosecution, the patent owner argued that Hayashi was not relevant art because Hayashi teaches a fixed screen that is attached to a building and is not movable in relation to the viewers [Decl. of Michael Burk at Exh. 18 at 5:37-6:3]. Also, during initial prosecution, the patent owner noted that Hayashi "doesn't move his screens, he moves his audiences."  The Examiner agreed with patent owner's disclaimer of the term "positioning means" by allowing the case over Hayashi, noting that the prior art of record (e.g., Hayashi) does not show, in particular, a screen positioning means as claimed [*Id.,* at Exh. 19 at p. 2].

It is well established that whenever an applicant makes a clear and unambiguous argument that a claim does not cover a certain feature, this argument becomes binding on the applicant.  Coverage of that feature is considered "disclaimed" by the applicant and cannot be recovered.  In fact, the facts surrounding the disclaimer of the meaning of "positioning means" are strikingly similar to the facts set forth in *Southwall Technologies*.[8] In the case at hand, and in *Southwall Technologies*, the meaning of a

---

[8] *Southwall Technologies Inc. v. Cardinal IG Company* 54 F.3d 1570, 34 U.S.P.Q.2d 1673. Southwall sued Cardinal for patent infringement of US 4,799,745 (US '745).  The claims of US '745 included the feature that "the dielectric is a sputter-deposited dielectric."  During prosecution of US '745, Southwall explained that its sputter-deposited dielectric is laid down in a one-step reactive sputtering process, which distinguishes the claims over the prior art.  The prior art cited against US '745, disclosed a two-step process of forming a dielectric layer.  The Federal Circuit concluded that the prosecution history limits the interpretation of "sputter-deposited dielectric" layer to exclude any dielectric layer formed by a two-step process.  The claims were therefore limited to sputtered-deposited dielectric layers that were formed by a one-step process, even though this specific limitation is not set forth in the claim language.  In a similar manner, positioning means cannot be interpreted to include a building since the Patent Owner argued that a building cannot be a positioning means during prosecution of the claims.

16

1   term in the claims was disclaimed, and thus limited to a narrower interpretation during

2   prosecution, without amending the term.  Thus, it was perfectly reasonable for LADS

3   to argue that the term be interpreted in a manner that was consistent with the disclaimer

4   made during the initial prosecution history.

5        Defendants' characterization of LADS' position as a desperate ploy to save their

6   claims from invalidity is clearly not true.  In fact, LADS was precluded, by prosecution

7   history estoppel, from taking Defendants' broadened interpretation of the claims.

8                  *ii.*    *"Substantially Contiguous"*

9        Defendants argue LADS took an unreasonable position regarding the term

10   "substantially contiguous."  It must be noted that Defendants paraphrase LADS'

11   argument in alleging that LADS took the position that "substantially contiguous"

12   meant "wholly continuous without any gaps" [Dkt. 223 at 8:9-17].  Defendants'

13   paraphrase grossly misrepresents LADS's position regarding the meaning of this term.

14        During reexamination, LADS actually argued that the Examiner improperly

15   interpreted the term substantially contiguous as meaning "largely" contiguous and that

16   the viewing area can be just a small portion of each surface perimeter.  [Decl. of

17   Michael Burk at Exh. 20 at p.12].While LADS agreed that substantially contiguous

18   may mean "largely" contiguous", LADS disagreed that this phrase would, however,

19   cover a system that merely had a majority of the surface perimeters shaped and sized to

20   be continuous [*Id.*].  LADS further argued that a person of ordinary skill in the art

21   would understand the term "substantially contiguous" to mean that each of the interior

22   and exterior surface-perimeters are shaped and sized to be continuous in appearance, or

23   shaped and sized to be mostly continuous in appearance [*Id.*].  This phrase would not,

24   however, cover a system that merely had a majority of the surface perimeters shaped

25   and sized to be continuous.  LADS also argued that this phrase would also not cover

26   systems where there are significant structures that completely and distinctly separate

27

28

the screens, thereby making each of the screen surface-perimeters separate and distinct in appearance instead of being substantially continuous in appearance [*Id.*].

Defendant also distorted LADS' arguments by focusing on the term "substantially contiguous" divorced from the rest of the claim.  The full language of the claims requires that the screen display is "substantially contiguous in appearance and [has] a display-surface viewing area of a panoramic type … on which, substantially contiguous panoramic visual-media content and segmented visual-media content can be imaged" [Decl. of Michael Burk at Exh. 21, at Col. 1, Claim 1, ll. 47-56].  If the "substantially contiguous" screen display had gaps or was in any significant way discontinuous, the display of the substantially contiguous panoramic visual media would be disrupted, making it difficult to maintain the continuity of the panoramic visual media.

When taking into account LADS' full argument regarding the term "substantially contiguous" rather than Defendants' misleading paraphrase of LADS' argument, the argument is reasonable and not in any way "ridiculous."

### iii.    A "Large Audience"

Defendants refer to a single embodiment of LADS' patent (at FIG. 11, in which only about 8 chairs are visible), and make the incredulous leap that this figure, taken by itself, allegedly demonstrates that LADS' argument on the meaning of "large audience" was "ridiculous" [Dkt. 223 at 8:17-21].

LADS notes that FIG. 11 of LADS' patent is clearly an incomplete rendering of the venue and it is not possible from the figure to determine how many chairs are actually present in the venue.  Since the screen-display is depicted as having a 360-degree viewing area, there are most certainly chairs present around the entire circumference of the screen.  Additionally, there is nothing in the drawing that would preclude the presence of other rows of chairs that are simply not visible because of the perspective depicted in the drawing.

d.     Defendants' Arguments Contradict Their Actions

If Defendants sincerely believed that LADS' claim constructions were "ridiculous" as they now claim, one must then question why Defendants expended time and money responding to LADS' arguments during reexamination.  There was no requirement for Defendants to provide any response during the reexamination proceedings, and any lack of response by the Defendants would not have any prejudicial effect on the proceedings.

But Defendants did feel the need to respond, and that alone shows that Defendants did not truly believe that LADS' positions had no chance of success. Moreover, it is quite significant that the PTO never expunged any of LADS' papers for being improper, while it did expunge papers submitted by Defendants, and the PTO never made any findings that support Defendants' allegations of improper conduct.

e.     Many of LADS' Claims Were Found to Be Allowable Which Demonstrates that LADS Acted Reasonably

Defendants finally argue that the ultimate rejection of the asserted claims is a clear sign that the LADS' Action was meritless [Dkt. 223 at p. 9]. But the Patent Office, in fact, allowed and issued claims over the prior art that was cited [Decl. of Michael Burk at Exh. 15].  These allowances confirm that there were valid inventions at issue and that LADS' arguments were not frivolous, nor was there any impropriety associated with LADS' vigorous defense of its patent.

f.     Awarding Attorneys' Fees to Defendants is Improper in View of Defendants' Actions During Reexamination

As is recounted above, Defendants improperly increased the time and costs involved in the reexamination by not following PTO rules.  The PTO even expunged papers submitted by Defendants due to these rule violations, which is almost unheard of in the PTO.  As such, Defendants' improper actions foreclose them from coming to this Court seeking recovery of attorneys' fees.

19

1    Defendants also asserted subject matter that was not deemed proper subject

2    matter for the reexamination.  After the first Office Action, Defendants (working

3    jointly with and through the Lakers) devoted a significant portion of their argument

4    trying to convince the Examiner to accept their rejections with respect to the Olympics

5    display [Decl. of Michael Burk at Exh. 22].  They again later tried to convince the

6    Examiner to adopt arguments regarding the Olympics display prior art [*Id.,* at Exh. 23].

7    In response to their comments, the Examiner indicated that he had reviewed the art, but

8    declined to adopt the arguments.  Undeterred, Defendants once again raised this issue

9    in their next response [*Id.,* at Exh. 24].  The impropriety of Defendants again forced the

10   Examiner to expunge the offending response [*Id.,* at Exh. 25].

11   It was the continued improper actions of Defendants, and not the actions of the

12   LADS, that increased Defendants' costs.  Defendants are therefore improperly asking

13   the Court to require LADS to reimburse Defendants' for their own improper conduct.

### 6.    LADS' Motion for Reinstatement

15   Defendants argue that LADS' attempt to lift the stay in this case was improper

16   [Dkt. 223 at 10:2-9].  While the Court did not grant LADS' motion, it did not deny it

17   either in lifting the stay *sua sponte* before dismissing the case and finding that LADS'

18   motion seeking to lift the stay and reinstate the case was moot as a result.  Nothing in

19   LADS' motion seeking to lift the stay or the Court's order dismissing the case suggests

20   that LADS acted improperly or that this case is "exceptional."

21   Further, Defendants never produced much of the critical information and

22   documents that LADS had requested six months before the stay was entered [Dkt. 219

23   at pp. 5-9; Dkt. 220 at ¶¶2-4 and Exh. 1&2; Decl. of Michael Burk at Exh. 26].  LADS

24   maintains that had Defendants produced this discoverable information it would have

25   provided evidence of infringement of some of the original surviving claims which had

26   not previously been disclosed since it was not clear from the available video of the

27   display devices which of the original surviving claims were being infringed.  As it

28

1   turns out, Defendants' failure to do so prior to the entry of the stay and ultimate

2   dismissal of the case paid off for them.  LADS' efforts to obtain discoverable

3   information that Defendants improperly withheld prior to the stay and to conduct some

4   additional limited discovery is neither egregious nor "exceptional."

### 7.   LADS' Good-Faith Efforts to Cooperate with Defendants

6   Throughout this case LADS went above and beyond its duty in seeking to

7   cooperate with Defendants and reduce the attorneys' fees and expenses for both sides.

8   As mentioned above, and in order to facilitate settlement discussions, LADS consented

9   to multiple generous extensions of time (totaling nearly three months) for Defendants

10  to file their answer [Dkt. 12, 20 & 29].  Then, after Defendants filed their motion to

11  stay, counsel for LADS proposed to postpone the depositions that LADS had

12  previously noticed until after the motion to stay had been decided [Decl. of Michael

13  Burk at Exh. 27], and no depositions therefore occurred [Dkt. 220 at ¶5].

14  LADS also demonstrated its cooperation in this case by agreeing to extremely

15  reasonable terms for the inspection of the display device used by former Defendant

16  The Los Angeles Lakers, Inc., including the payment of Lakers' expenses by LADS

17  [Dkt. 174 at ¶¶2 & 5].  Since the Lakers also cooperated with LADS, a settlement was

18  ultimately reached between LADS and the Lakers [Decl. of Michael Burk at ¶3].

19  Such actions by LADS are not those of a party engaging in a "shakedown" [Dkt.

20  223 at 1:16], or seeking to "leverage costly discovery for a possible settlement" [*Id.,* at

21  10:5], or engaging in "atrocious behavior" [*Id.,* at 10:11], or embarking on a strategy to

22  "increase the costs of this litigation to an unacceptable level in an attempt to pressure

23  financially well-heeled Defendants into a settlement" [*Id.,* at 10:15-16], or engaging in

24  "litigation misconduct" [*Id.,* at 13:11], as Defendants falsely allege in seeking to

25  recover attorneys' fees to which they are not entitled.

26

27

28

**B.**     **Counsel for Defendants Admitted that this Case is Not Frivolous**

As if any further proof that Defendants' Motion is baseless were needed, on December 15, 2009, Andrew Langsam, lead counsel for Defendants, copied Michael Burk, counsel for LADS, on an email thread which demonstrates that Defendants know this case was not frivolous despite the representations they now make in their Motion. In that email, counsel for Defendants admitted that "[a]t this point, without being able to talk to the inventor and blowing holes through the interpretation of the language of the Patent's claims, the position of infringement is **not frivolous**" [emphasis supplied][Decl. of Michael Burk at Exh. 28].

Counsel for Defendants concluded that this suit is "not frivolous" after having conducted an extensive analysis into LADS' patent and claims.  According to Mr. Langsam's billing records, between November 18, 2009 and December 15, 2009 (the latter being the date of the above-quoted admission that this case is "not frivolous"), Mr. Langsam billed a total of 17.7 hours and the amount of  $10,531.50 for such tasks as (a) reviewing the patent in question, (b) reviewing prior art, (c) reviewing the file wrapper history, (d) personally conducting internet searches on LADS, (e) reviewing venue standards, (f) reviewing the claims, (g) reviewing LADS' website, (h) responding to his clients' questions about the scope of the claims, prior art, exposure to liability, and the amount of potential damages (i) reviewing new prior art provided by client, (j) reviewing results of a patentability search, more reading and analysis of prior art, (k) reviewing liability/exposure, (l) further review of results of prior art search, (m) further review of the patent, prior art, and the accused infringing systems, (n) obtaining copy of Tour on DVD, (o) considering terms used in patent and obtained drawings of the Justin Timberlake Tour, (p) preparing comprehensive status updating email to client, (q) reviewing Justin Timberlake concert DVD and print-out screen shots of use of curtain with images on front and back, (r) further review of file wrapper history, and (s) conducting a further prior art search [Dkt. 224-21 at pp. 597-603].

In addition to the 17.7 hours totaling $10,531.50 that Mr. Langsam billed, other attorneys for Defendants billed an additional combined 6.7 hours and $4,107 for work that contributed to the conclusion that this case was "not frivolous" [*Id.*].  Therefore, Defendants' counsel billed a total of 24.4 hours totaling $14,638.50 in analyzing this case before concluding it was "not frivolous."  Defendants ironically include the sum of $14,638.50 that their counsel billed for concluding this case is "not frivolous" in the fees they now seek to recover in their Motion by falsely alleging this case is frivolous.

The only thing that is frivolous here is Defendants' Motion.  The admission by Defendants that this case is "not frivolous" and the complete lack of merit in the arguments set forth in their Motion demonstrate that this case is not exceptional.  Even if Defendants had somehow shown this case to be "exceptional," the award of fees would still not be justified.  *See, e.g., Kreative Power,* 2015 WL 1967289 at *4. Defendants' Motion should therefore be denied.

**C.**   **Defendants' Claim for Attorneys' Fees is Excessive and Unreasonable**

When awarding fees under §285, the aggrieved party is entitled to an award of "the portion of its attorney fees which related to the vexatious litigation strategy and other misconduct." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, No. SACV 0400689MRP VBKX, 2007 WL 6137003, at *2 (C.D. Cal. Apr. 16, 2007), *quoting Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1553 (Fed. Cir. 1989); *see also Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*, No. SACV 11-01011 AG, 2015 WL 178417, at *4 (C.D. Cal. Jan. 6, 2015)(holding that "the only fees allowed are those Defendants would not have incurred but for Cambrian's continued inclusion of the Generation 1 and 3 products in the case after June 17, 2013").  Here, Defendants have failed to demonstrate that the entire sum (or even any portion thereof) of $755,925.86 arose out of misconduct sufficient to find this case "exceptional" and the record fails to establish a causal nexus between the fees claimed and the misconduct alleged.

Defendants' claim for the sum of $755,925.86 is excessive and unreasonable on its face given how little occurred in this case prior to its dismissal.  No depositions were taken, and only limited written discovery occurred.  The Timberlake Defendants collectively produced only 928 pages of documents, and the Spears Defendants collectively produced only 2,441 pages [Decl. of Michael Burk at ¶4].  Very little time was spent by Defendants on responding to interrogatories because the sets of interrogatories served on the various Defendants were substantially identical and in response Defendants merely asserted boilerplate objections and failed to provide any significant information [*Id.,* at Exh. 25].   No motions to compel or other discovery motions were filed.  No *Markman* hearing occurred, no summary judgment motions were filed, and Defendants never filed or responded to any motions to dismiss.  Given how little actually occurred in this case, $755,925.86 is transparently unreasonable.

Defendants seek to recover fees billed by 26 different partners, associates, paralegals, clerks and support staff [Dkt. 224 at ¶30].  Billing for so many persons on a single case is inefficient on its face.

To determine whether the hours claimed were reasonably billed, courts should examine the billing records. *See In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1305 (9th Cir.1994)(stating the prevailing party has burden of submitting billing records establishing the number of hours it has requested are reasonable).  The district court should exclude from the lodestar amount hours that are not reasonably expended because they are "excessive, redundant, or otherwise unnecessary." *Van Gerwen v. Guarantee Mut. Life Co.,* 214 F.3d 1041, 1045 (9th Cir. 2000).

Defendants' attorneys failed to exercise proper billing judgment.  For example, partners billing at a high rate did lower level work which should have been completed by paralegals or lower-billing associates, such as obtaining copies of DVD's, doing legal research, doing internet research, filing documents, and other similar tasks [*See, e.g.,* Dkt. 224 at Exh. S at pp. 601-02, 629, 637, 646, 670, 675].  Defendants seek to recover fees for 26 different partners, associates, paralegals, clerks and support staff, so

24

1   there were plenty of available lower-cost individuals that could have performed this

2   lower-level work rather than partners charging $495-$730 per hour.

3       Also, the billing records submitted by Defendants are not sufficiently detailed to

4   allow for a meaningful review.  Defendants submitted 400 pages of invoices using

5   block billing, and in just the first 100 pages (covering 11/12/09-12/7/11) alone,

6   Defendants' attorneys' billed for work described as "etc." on 177 occasions [*See* Dkt.

7   224 at Exh. S at pp. 597-696].  Defendants also failed to provide any fee agreements

8   which further precludes a meaningful review of the billing by their attorneys.

9       Given length constraints, LADS is unable to provide a detailed response to

10  Defendants' assertion that the amount of their attorneys' fees (incurred in a case

11  deemed "not frivolous" by their lead counsel) is reasonable and necessary.  LADS

12  requests that in the event the Court were inclined to grant Defendants' Motion, that the

13  Court set a separate hearing and briefing schedule for that determination consistent

14  with other cases handling the issue in that manner.[9]

15  **III.   CONCLUSION**

16      As shown above, a review of the prior findings by this Court, the EDTX and the

17  PTO demonstrate that there has never been any finding in this case that LADS engaged

18  in improper conduct, and it is clear from the facts that LADS never engaged in

19  improper conduct that would render this an "exceptional case" that would justify the

20  award of attorneys' fees to Defendants.   Defendants' Motion should therefore be

21  denied.

22

23  [9] *See, e.g., Logic Devices, Inc. v. Apple Inc.,* 2014 WL 6844821, *1 (N.D. Cal. Dec. 4, 2014)(after
    finding the case was exceptional the court entered an order setting forth the special master procedure
24  to determine the *amount* of fees); *Kilopass Tech. Inc. v. Sidense Corp.,* No. C 10-02066 SI, 2014 WL
    3956703, at *15 (N.D. Cal. Aug. 12, 2014)(after deciding to award attorneys' fees the court set forth
25  a briefing schedule on the appropriate amount of fees to be awarded; *Homeland Housewares, LLC v.
    Sorensen Research,* 581 F. App'x 877, 881 (Fed. Cir. 2014)(emphasizing how large the task is to
26  determine the appropriate amount of fees and stating that in the case before it the district court "was
    reasonably careful in calculating the award" and it "independently reviewed Homeland's billing
27  entries line by line" (emphasis added).

28
                                    25

1

2   Dated:  July 22, 2015

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE BURK LAW FIRM, P.C.**

By:   /s/ Michael G. Burk

Michael G. Burk (admitted *pro hac vice*)
burk@burklaw.com
Colten W. Smith, Of Counsel
(admitted *pro hac vice*)
smith@burklaw.com
248 Addie Roy Road, Suite A-203
Austin, Texas 78746
Phone:  (512) 306-9828
Facsimile:  (512) 306-9825

**MEYERTONS, HOOD, KIVLIN,
KOWERT & GOETZEL, P.C.**

Eric B. Meyertons (admitted *pro hac vice*)
emeyertons@intprop.com
Ryan T. Beard (admitted *pro hac vice*)
rbeard@intprop.com
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
(512) 853-8800 (telephone)
(512) 853-8801 (facsimile)

**GROBATY AND PITET LLP**

Christopher L. Pitet (SBN 196861)
cpitet@octrials.com
100 Bayview Circle, Suite 201
Newport Beach, CA  92660
(949) 502-7760 (telephone)
(949) 502-7762 (facsimile)

*Attorneys for Plaintiff
Large Audience Display Systems LLC*