Michael J. Niborski (State Bar No. 192111)
e-mail: mniborski@pryorcashman.com
**PRYOR CASHMAN LLP**
1801 Century Park East, 24th Floor
Los Angeles, California 90067-2302
Tel:   (310) 556-9608
Fax:   (310) 556-9670

Andrew S. Langsam (admitted *pro hac vice*)
e-mail: alangsam@pryorcashman.com
**PRYOR CASHMAN LLP**
7 Times Square, 38th Floor
New York, New York 10036-6569
Tel:   (212) 326-0180
Fax:   (212) 515-6969

***Attorneys for Defendants***
Tennman Productions, LLC; Justin Timberlake;
Spears King Pole, Inc.; and Britney Spears

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARGE AUDIENCE DISPLAY SYSTEMS, LLC,<br><br>  Plaintiff,<br><br>vs.<br><br>TENNMAN PRODUCTIONS, LLC, JUSTIN TIMBERLAKE, BRITNEY TOURING, INC., BRITNEY SPEARS, STEVE DIXON and MUSIC TOUR MANAGEMENT, INC.,<br><br>  Defendants. | Case No. CV 11-03398 R (RZx)<br><br>**DEFENDANTS' REPLY IN RESPONSE TO PLAINTIFF'S OPPOSITION TO, AND IN FURTHER SUPPORT OF, DEFENDANTS' MOTION FOR RECOVERY OF ATTORNEYS' FEES, COSTS, AND EXPENSES**<br><br>[*Declaration of Andrew S. Langsam filed concurrently herewith*]<br><br><u>Hearing</u>:<br>Date:  August 17, 2015<br>Time:  10:00 a.m.<br>Place: Courtroom 8<br>    Spring Street Courthouse |

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. iii

Introduction .............................................................................................................1

Argument..................................................................................................................2

    I.    Legal Standard for Determining Whether a Case Is "Exceptional" .....2

        A.    Cases Cited by Plaintiff Are Inapposite......................................2

        B.    This Court Has Discretion to Designate This Case "Exceptional" .................................................................................5

    II.    Plaintiff's Use of Defendants' Counsel's Email Is Impermissible, Unethical, and Misrepresentative.........................................................6

        A.    The Langsam Email Is Privileged, and Its Privilege Was Never Waived, Thus Its Use Is Impermissible ...........................6

        B.    Even If the Langsam Email Could Be Used as Evidence, Plaintiff Wholly Mischaracterizes It to Reach an Improper Conclusion ...................................................................................8

    III.    Defendants Did Not Breach the Confidentiality Agreement Governing the Settlement Discussions..................................................10

    IV.    Plaintiff's Request for Defendants' Gross Revenues *Was* Frivolous.............................................................................................11

        A.    Defendants' Gross Revenues Had No Nexus to Plaintiff's Claim ..........................................................................................11

        B.    Defendants' Own Acknowledgment of Their High Net Worth Does Not Render Plaintiff's Request Permissible.........13

    V.    Defendants' Conduct Before the Patent Office Is Irrelevant But Was *Not* Improper ...........................................................................14

    VI.    Plaintiff's Conduct Before the Patent Office *Was* Egregious.............17

        A.    Plaintiff Breached Its Duty of Candor and Good Faith ............17

B.     Plaintiff's Proposed Claim Constructions *Were* Ridiculous.....17

C.     Defendants Were Clearly the Prevailing Party in the Reexamination .........................................................................18

VII.   Plaintiff's Commencement of This Case in the Eastern District of Texas *Was* Improper..........................................................................19

VIII.  Plaintiff Did *Not* Make Good Faith Effort to Cooperate With Defendants ........................................................................................22

IX.   Defendants' Requested Attorneys' Fees Are Entirely Reasonable.....22

Conclusion .............................................................................................23

ii

# TABLE OF AUTHORITIES

**CASES**                                                             **PAGE(s)**

*Computer Software Protection, LLC v. Adobe Systems Inc.*,

    No. Civ. No. 12-455-SLR, 2015 U.S. Dist. LEXIS 41346

    (D. Del. Mar. 31, 2015) ................................................................ 4-5

*Datel Holdings Ltd. v. Microsoft Corp.*,

    No. C-09-05535 EDL, 2011 U.S. Dist. LEXIS 30872

    (N.D. Cal. Mar. 11, 2011) .............................................................. 7

*Ericsson, Inc. v. D-Link Systems*,

    773 F.3d 1201 (Fed. Cir. 2014) ...................................................... 12

*Fogerty v. Fantasy, Inc.*,

    510 U.S. 517 (1994) ........................................................................ 5

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,

    318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................... 12

*Gametek LLC v. Zynga, Inc.*,

    No. CV-13-3493-RS, 2014 U.S. Dist. LEXIS 122834

    (N.D. Cal. Sept. 2, 2014) ............................................................. 2, 4

*Kilopass Technology, Inc. v. Sidense Corp.*,

    No. 10-cv-02066-SI, 2015 U.S. Dist. LEXIS 30650

    (N.D. Cal. Mar. 11, 2015) .............................................................. 5

*Kreative Power, LLC v. Monoprice, Inc.*,

    No. 14-cv-02991-SI, 2015 U.S. Dist. LEXIS 57073

    (N.D. Cal. Apr. 30, 2015) .............................................................. 3

*Luna Gaming--San Diego, LLC v. Dorsey & Whitney, LLP*,

    No. 06cv2804 BTM (WMc), 2010 U.S. Dist. LEXIS 3188

    (S.D. Cal. Jan. 13, 2010) ................................................................ 8

*MyMedicalRecords, Inc. v. Jardogs, LLC*,

    No. 2:13-cv-07285-ODW(SHx), 2015 U.S. Dist. LEXIS 51804

    (C.D. Cal. Apr. 20, 2015) ............................................................... 3

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,

    134 S. Ct. 1749 (2014) ............................................................. 2, 5

*ResQNet.com, Inc. v. Lansa, Inc.*,

    594 F.3d 860 (Fed. Cir. 2010) ..................................................... 12

*SFA Systems, LLC v. Newegg Inc.*,

    No. 2014-1712, 2015 U.S. App. LEXIS 11892 (Fed. Cir. July 10, 2015) ....... 17

*Site Update Solutions, LLC v. Accor North America, Inc.*,

    No. 5:11-cv-3306-PSG, 2015 U.S. Dist. LEXIS 17603

    (N.D. Cal. Feb. 11, 2015) .............................................................. 4

*TransPerfect Global, Inc. v. MotionPoint Corp.*,

    No. C 10-2590 CW, 2014 U.S. Dist. LEXIS 159805

    (N.D. Cal. Nov. 13, 2014) ............................................................. 4

*Turek v. Stanford University Medical Center*,

    No. C 12-00444 WHA, 2013 U.S. Dist. LEXIS 151107

    (N.D. Cal. Oct. 17, 2013) .............................................................. 7

*Uniloc USA, Inc. v. Microsoft Corp.*,

    632 F.3d 1292 (Fed. Cir. 2011) ................................................... 12

**STATUTES**                                       **PAGE(s)**

Fed. R. Evid. 502(b) ........................................................... 6, 7, 8

35 U.S.C. § 252 ................................................................... 18

35 U.S.C. § 285 ..................................................................... 2

37 CFR § 1.948(a)(3) ............................................................. 15

**ARTICLES**                                                                      **PAGE(s)**

Harriet Gibsone, *Being Britney: the Ups and Downs of a Pop Superstar*, The

    Guardian (May 14, 2015, 10:12 AM),

    http://www.theguardian.com/music/2015/may/14/being-britney-the-ups-and-

    downs-of-a-pop-superstar ................................................................................. 13

*Entertainment Superstar Justin Timberlake To Make Debut At American Century*

    *Championship*, PRNewswire (June 10, 2015),

    http://www.prnewswire.com/news-releases/entertainment-superstar-justin-

    timberlake-to-make-debut-at-american-century-championship-300097123.html

    .................................................................................................... 13-14

Tennman Productions, LLC, Justin Timberlake ("Timberlake"), Spears King Pole, Inc., and Britney Spears ("Spears") (Timberlake and Spears being collectively, "Defendants") respectfully submit this reply brief in response to Plaintiff Large Audience Display System, LLC's ("LADS" or "Plaintiff") opposition to, and in further support of, Defendants' motion for attorneys' fees. (*See* Plaintiff's 7/22/15 Opposition Brief ("Opp. Br.") and Defendants' 6/30/15 Moving Brief ("Defs.' Br.").)

## INTRODUCTION

Plaintiff makes much of the fact that there have been no express findings of its pervasive misconduct—not yet. (*See, e.g.*, Opp. Br. at 1, 2, 5, 5-6, 8, 9, 25, 19.) However, that is only because the Court has not had the need nor opportunity to make such findings until now. Defendants therefore respectfully request that the Court, in light of Plaintiff's constant and consistent impropriety (as originally set forth in the Motion for Attorneys' Fees, Costs, and Expenses), find the above-captioned case to be "exceptional" and award Defendants the attorneys' fees they were forced to incur in response to Plaintiff's frivolous lawsuit, which was nothing more than an attempt to extract an undeserved settlement because of the known high cost to defend a case based on alleged patent infringement.

To that end, Defendants request that the Court look to the factual narrative presented in their moving brief and, in consideration of judicial economy, Defendants refrain from repeating the same herein. However, Defendants submit this reply to refute and correct the myriad misrepresentations and mischaracterizations in Plaintiff's brief—simply the latest entry in the long line of Plaintiff's egregious behavior throughout this entire shakedown of a litigation.

**ARGUMENT**

## I. Legal Standard for Determining Whether a Case Is "Exceptional"

As Defendants stated in their moving brief, the Court is empowered to award attorneys' fees, under 35 U.S.C. § 285, in any patent case that is "exceptional." (Defs.' Br. at 14.)  "District courts may determine whether a case is 'exceptional' in the ***case-by-case*** exercise of their ***discretion***, considering the ***totality of the circumstances***." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (emphases added).[1]  "[A]n 'exceptional' case is simply one that ***stands out from others*** with respect to the ***substantive strength*** of a party's litigating position (considering both the governing law and the facts of the case) or the ***unreasonable manner in which the case was litigated***." *Id.* (emphases added). Here, the strength of Plaintiff's case was proven to be nil (every claim alleged to be infringed was soundly held invalid on multiple pieces of anticipatory and obviating pieces of prior art) ***and*** the case was litigated by Plaintiff in a wholly unreasonable manner, one that was deliberately and intentionally expensive to Defendants, all to try to shake out a settlement.  As Plaintiff correctly notes, "post-*Octane* decisions awarding fees have concerned ***egregious behavior***"—with which the instant action is replete.  *Gametek LLC v. Zynga, Inc.*, No. CV 13-2546 RS, 2014 U.S. Dist. LEXIS 122834, *13 (N.D. Cal. Sept. 2, 2014) (emphasis added). (*See* Opp. Br. at 3.)

### A. Cases Cited by Plaintiff Are Inapposite

A number of the cases upon which Plaintiff relies to support its conclusion that the instant action is not "exceptional" do ***not*** actually support Plaintiff's

---

[1] Plaintiff's observation that a court retains the discretion to ***not*** award attorneys' fees even in an exceptional case merely confirms Plaintiff's understanding  of the word "discretion,"  nothing more.  (Opp. Br. at 2-3)

position.  Even if Plaintiff's cited cases were not inapposite (which they are), that would not change the applicable standard for this Court's analysis of the facts herein.  The Court has the discretion to award attorneys' fees as long as it determines that the instant case is "exceptional," that is, that it "stands out from others" because Plaintiff's behavior was egregious.  Here, it was, and thus attorneys' fees are appropriate.

In one case cited by Plaintiff, *MyMedicalRecords*, the court found that the plaintiff had committed only one sanctionable action throughout the litigation, which did not raise the case to the "exceptional" level required by § 285.  *MyMedicalRecords, Inc. v. Jardogs*, No. 2:13-cv-07285-ODW(SHx), LLC, 2015 U.S. Dist. LEXIS 51804, at *10-11 (C.D. Cal. Apr. 20, 2015) (plaintiff's failure to stipulate to its patent's invalidity following claim construction was unreasonable).  However, significantly yet unmentioned by Plaintiff, while that court did not award attorneys' fees under § 285, the court ***did award attorneys' fees*** under the court's inherent power.  *Id.* at *12-15.  Here, by contrast, Plaintiff's behavior was so consistently and constantly egregious that counting discrete instances of misconduct extends beyond the fingers of two hands.  Thus, there are sufficient individually sanctionable actions and positions taken by Plaintiff throughout the litigation to justify a finding that this case is exceptional.

*Kreative Power,* also relied upon by Plaintiff, saw the denial of an attorneys' fees motion that was "based ***primarily*** on the fact that [plaintiff] made losing arguments."  *Kreative Power, LLC v. Monoprice, Inc.*, No. 14-cv-02991-SI, 2015 U.S. Dist. LEXIS 57073, at *16 (N.D. Cal. Apr. 30, 2015) (emphasis added).  In this case, however, the fact that Plaintiff lost on ***all*** of its substantive motions[2] and

---

[2] The only motion that Plaintiff won was its basically procedural motion to amend its complaint to add two more defendants.  (Opp. Br. at 5; dkt. 55.)

1   *all* of its arguments in the Patent Office is ***but one of many*** factors that, in

2   combination, render this case exceptionally egregious and meriting an award of

3   attorneys' fees.

4       *Gametek* involved a patent infringement dispute that was dismissed ***on the***

5   ***pleadings***, which defendants (unsuccessfully) argued rendered the case ***ipso facto***

6   "exceptional."  *Gametek*, 2014 U.S. Dist. LEXIS 122834, at \*10.  In the present

7   case, though, Plaintiff's patent claims were not dismissed on the pleadings, but

8   rather only after nearly ***six years*** in which Plaintiff repeatedly engaged in

9   egregious behavior which forced Defendants to spend attorneys' fees defending

10  against the same. Moreover, Defendants do not argue that one particular fact

11  renders the entire case ipso facto exceptional but instead rely on Plaintiff's ***many***

12  ***instances of misconduct and frivolous positions*** as the basis for seeking recovery

13  of the attorneys' fees.  Defendants' moving brief is replete with representative

14  (though not exhaustive) examples of Plaintiff's egregious misconduct.

15      The other cases Plaintiff cites are factually inapposite.  In *TransPerfect*, the

16  court denied a ***plaintiff's*** motion for attorneys' fees ***against defendant***—in stark

17  contrast to the instant action, in which it is Plaintiff that initiated and maintained a

18  frivolous lawsuit and behaved atrociously throughout the suit's pendency.  *See*

19  *TransPerfect Global, Inc. v. MotionPoint Corp.*, No. C 10-2590 CW, 2014 U.S.

20  Dist. LEXIS 159805, at \*22-25 (N.D. Cal. Nov. 13, 2014).  And, the underlying

21  dispute in *Site Update* ***ended in settlement***, meaning that (unlike here) defendant

22  sought to recover its attorneys' fees only after voluntarily agreeing to a resolution

23  of the case and its dismissal.  *See Site Update Solutions, LLC v. Accor North*

24  *America, Inc.*,No. 5-11-cv-3306-PSG, 2015 U.S. Dist. LEXIS 17603, at \*5-7 (N.D.

25  Cal. Feb. 11, 2015).

26      Finally, *Computer Software*—which is from the District of Delaware—also

27  involved a post-voluntary dismissal motion for attorneys' fees, meaning that it was

28

*not yet clear* whether defendants "would have succeeded on the merits." *Computer Software Prot., LLC v. Adobe Sys., Inc.*, No. 12-451-SLR, 2015 U.S. Dist. LEXIS 41346, at *7 (D. Del. Mar. 31, 2015).  Here, though, Plaintiff has **clearly lost on the merits, acted egregiously, and taken multiple frivolous positions**, all costing Defendants significant attorneys' fees.  (*See* Dkt. 222.)

### B.    This Court Has Discretion to Designate This Case "Exceptional"

As noted above, the determination of whether the instant case is exceptional is **within this Court's discretion**.  In reaching its decision, the Court may consider such factors as "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'"  *Octane*, 134 S. Ct. at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)).  Where, as here, plaintiff has shown a consistent pattern of litigation misconduct—including asserting untenable claim constructions, opposing reasonable motions, falsifying information relating to venue for improper forum shopping, and seeking additional discovery after all claims alleged to be infringed were determined invalid to consider assertion of additional original claims of the patent—the Court should, as other courts have, award attorneys' fees.  *See, e.g.*, *Kilopass Tech., Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2015 U.S. Dist. LEXIS 30650, at *22 (N.D. Cal. Mar. 11, 2015).

Whether to deem the instant case exceptional and award attorneys' fees is thus entirely within the purview of the Court's discretion.  Considering that even Plaintiff's most recent brief is replete with unethical conduct and riddled with duplicity and misrepresentations, the Court should elect to do so.

**II.   Plaintiff's Use of Defendants' Counsel's Email Is Impermissible, Unethical, and Misrepresentative**

In its brief, Plaintiff attaches and quotes a ***privileged*** email from Defendants' counsel, Andrew S. Langsam to representatives of the Defendant Timberlake (the "Langsam Email").  (*See* Opp. Br. at 22-23; Declaration of Michael Burk submitted with Opp. Br. ("Burk Decl."), Ex. 28.)  It is quite apparent that Plaintiff's counsel, Michael G. Burk, was ***inadvertently*** and ***unwittingly*** copied thereon.  It is clear from the face of the Langsam Email that it was misdirected to Mr. Burk; yet Mr. Burk never notified Mr. Langsam, Defendants' attorney, that he had received it; and the Email was not produced during discovery.  (Declaration of Andrew S. Langsam submitted concurrently herewith ("Langsam Decl.") ¶¶ 10-14.) Indeed, Mr. Langsam did not even learn that Mr. Burk had received this Email until reading Plaintiff's opposition brief of days ago.  (Langsam Decl. ¶ 15.)

**A.   The Langsam Email Is Privileged, and Its Privilege Was Never Waived, Thus Its Use Is Impermissible**

The Court should entirely disregard the Langsam Email as it is a privileged communication from an attorney (Mr. Langsam) to his clients (namely, representatives of Defendant Timberlake), and neither Plaintiff nor Mr. Burk has any standing or authority to waive that privilege.[3]  A disclosure of a privileged communication does ***not*** waive privilege where "(1) the disclosure is inadvertent; (2) the holder of the privilege [] took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error."  Fed. R. Evid. 502(b).

---

[3] Indeed, that Plaintiff filed the Langsam Email under seal indicates that Plaintiff understands that the Email is privileged—therefore Plaintiff must likewise understand that it has absolutely no authority to waive said privilege.  (*See* Burk Decl. ¶ 33; dkt. 232 (notice of filing under seal).)

6

"The first inquiry under Rule 502(b)—whether disclosure was inadvertent— is a simple one: did the disclosure occur by mistake or unintentionally?"  *Datel Holdings Ltd. v. Microsoft Corp.*, No. C-09-05535 EDL, 2011 U.S. Dist. LEXIS 30872, at *7 (N.D. Cal. Mar. 11, 2011).  Here, the Langsam Email was sent to Mr. Burk entirely unintentionally.  The Langsam Email was part of an email chain that included an individual with an email address beginning with "BKlarberg"; when Mr. Langsam was responding to an earlier email, he typed the leading "B" and the auto fill feature selected and inserted "Burk" instead of "BKlarberg." (Langsam Decl. ¶ 11.)  Mr. Burk never indicated that he had erroneously received what was an obviously privileged communication, Mr. Langsam did not notice nor appreciate the error until reading Plaintiff's opposition brief.  Thus, the Langsam Email was misdirected to Mr. Burk instead of to Mr. Klarberg.  (*See* Burk Decl., Ex. 28.).  Clearly, disclosure to Mr. Burk was accidental.

Second, as long as the privilege holder makes a "sufficient effort" to prevent disclosure of privileged material, an inadvertent disclosure will not waive privilege. *See, e.g.*, *Turek v. Stanford Univ. Med. Ctr.*, No. C 12-00444 WHA, 2013 U.S. Dist. LEXIS 151107, at *5 (N.D. Cal. Oct. 17, 2013) (defendant made "sufficient effort [] to prevent disclosure" of privileged document where defendant relied on experienced expert to bring correct report to deposition, but expert mistakenly brought privileged draft report).  Here, Mr. Langsam reasonably relied on the fact that he had directed his Email to the proper recipient.  If a misdirection occurred, he expected Mr. Burk (or any other unintended recipient) to promptly alert him to the same.  Certainly, Mr. Langsam expected such an alert from Mr. Burk, an attorney who is subject to the Canons of Ethics of the State Bar of Texas as well as those applicable to practitioners admitted *pro hac vice* in this Court.  Mr. Burk should, and likely does, know better.  Instead, Mr. Burk silently retained the Langsam Email without any indication that he had received the same (possibly

hoping to receive other misdirected and privileged documents of Defendants' internal advice and strategy). This is so unseemly as to qualify as egregious conduct.

"When the privilege holder objects *immediately upon discovery* of the inadvertent disclosure, 502(b)(3) is satisfied." *Luna Gaming--San Diego, LLC v. Dorsey & Whitney, LLP*, No. 06-cv-2804- BTM (WMc), 2010 U.S. Dist. LEXIS 3188, at *13 (S.D. Cal. Jan. 13, 2010) (emphasis added). Defendant Timberlake (the holder of the privilege in the Langsam Email) as well as Mr. Langsam discovered that the Langsam Email had been inadvertently disclosed *upon reading Plaintiff's just-filed opposition brief*. In this Reply, Defendants strenuously object to Plaintiff's improper, unauthorized disclosure and reliance thereon for any reason. Therefore, Defendants have satisfied the third requirement of Fed. R. Evid. 502(b) by objecting to an inadvertent disclosure immediately upon discovering it.

Thus, the Langsam Email was privileged, its privilege was never waived, and Plaintiff has no right to use it as evidence for any purpose. The Court should entirely disregard the Langsam Email as it was impermissibly relied upon by Plaintiff.

**B.     Even If the Langsam Email Could Be Used as Evidence, Plaintiff Wholly Mischaracterizes It to Reach an Improper Conclusion**

Even if the Court finds that the Langsam Email is admissible as evidence, Plaintiff's urged interpretation of the Email should be disregarded as flatly incorrect. Specifically, Plaintiff argues that, in the Langsam Email, Mr. Langsam "Admitted that this Case is Not Frivolous." (Opp. Br. at 22.) However, that is not accurate at all. Mr. Langsam stated *only* that, upon his preliminary review, without yet having access to the inventor to determine the scope of the words, Plaintiff's position on *infringement* did not seem frivolous—*not* that the case itself was not frivolous.

1    Very generally speaking, there are two main questions in a patent

2    infringement dispute: first, whether the asserted claims of the patent in suit are

3    valid, i.e., has an invention been defined over the relevant prior art to justify the

4    U.S. Patent Office's issuance of a patent?  Second, whether the patent is infringed,

5    i.e., is what the Defendants made, used or sold within the scope of the words of the

6    patent's asserted claims?  A plaintiff loses if the answer to either question is in the

7    negative.  In the Email, sent soon after the Complaint's filing, Mr. Langsam

8    provides his preliminary analysis and advice that the claims of U.S. Patent

9    No. 6,669,346 (the "Patent," the patent in suit) preliminarily seem too broad and

10   invalid—but that, if the claims are valid, then Plaintiff's position on the issue of

11   infringement may not be frivolous.  However, that is not even close to a statement

12   that the *case* itself is not frivolous.

13       To illustrate, suppose a patentee had somehow just recently obtained a

14   patent with a claim on a rubber-based tire (despite the fact that a claim to a rubber

15   tire clearly lacks the requisite novelty for patentability).  If the patentee sued

16   Goodyear Tire for infringing this "rubber tire" patent, the case itself would surely

17   be frivolous due to the claim's clear invalidity—even though the allegation of

18   infringement, standing alone, would not be frivolous because Goodyear, after all,

19   makes and sells rubber tires.  The Langsam Email suggests only that the allegation

20   of infringement, by itself, does not immediately appear to be frivolous, which is

21   not the same as a statement that the *case* is not frivolous—the mischaracterizing

22   reading that Plaintiff urges.  The case itself was indeed entirely frivolous, as

23   evidenced by the Patent Office's (subsequent) holding of every single claim that

24   LADS asserted was infringed to be invalid based on five individual pieces of prior

25   art showing the same claimed invention and 28 combinations of prior art patents

26   showing the claimed invention.  This was no close call; it was a "slam dunk" of

27   invalidity.

28

In any case, the Langsam Email was written on December 15, 2009, a mere month after this lawsuit was filed on November 11, 2009.  (*See* Burk Decl., Ex. 28; dkt. 1.)  Though Plaintiff makes much of the fact that Mr. Langsam billed 17.7 hours prior to writing the Email, very little time had elapsed (and very little time billed) between the action's inception and Mr. Langsam's tentative preliminary opinion as to the merits of Plaintiff's allegations of validity and infringement.  (Opp. Br. at 22.)  Plaintiff's improper attempt to bind Defendants based on a privileged communication made at the outset of this meritless action and limited only to the issue of infringement, not invalidity nor ultimate liability, is in ***poor taste, unethical, and wrong***.  It is clear evidence of egregiousness.

## III.  Defendants Did Not Breach the Confidentiality Agreement Governing the Settlement Discussions

Plaintiff attempts to obfuscate its settlement misconduct by incorrectly alleging that Defendants breached a confidentiality agreement.  (Opp. Br. 7-9.)  However, Defendants clearly did not breach this Settlement Discussion Agreement ("SDA").  (Burk Decl., Ex. 3.)

To start, the SDA, by its terms, covers only formal "settlement discussions," not all conversations between counsel that tangentially relate to the possibility of settlement.  (*See* Burk Decl., Ex. 3 ¶ 1 (referring to information disclosed "in the settlement discussions").)  Indeed, it is Defendants position, supported by the facts, that Plaintiff never really initiated settlement discussions; rather, Plaintiff only sought information to try to embarrass Defendants into offering a settlement amount to avoid disclosure of the information and the cost of litigation.  That was Plaintiff's motive, expressed to counsel for Defendants several times.  ***None*** of the email communications relied upon by Defendants in their moving papers were made during formal settlement discussions.  (*See* Declaration of Andrew S. Langsam submitted with Defs.' Br. ("Langsam 6/30 Decl."), Exs. O-R.)  Even

Plaintiff itself acknowledges that its request for Defendants' gross revenues, (Langsam 6/30 Decl., Ex. Q), was "informal[]." (Opp. Br. at 8.) Thus, Defendants did ***not*** improperly rely on "anything disclosed . . . in the settlement discussions" between the parties. (Burk Decl., Ex. 3 ¶ 1.)

Moreover, the SDA specifically states that "evidence that would otherwise be [] admissible ***shall not be rendered [] inadmissible*** as a result of it being [disclosed in the settlement discussions]." (Burk Decl., Ex. 3 ¶ 1 (emphasis added).) Plaintiff's ***requests*** for Defendants' gross revenues for touring concerts throughout the United States are now admissible as evidence of Plaintiff's egregious behavior during the course of this litigation. Thus, even if these requests had been made during formal settlement discussions, they would be ***admissible under the SDA's express terms***. Again, though, none of the underlying information requested from, nor provided by, Defendants was disclosed in settlement discussions.

The Court can, and should, consider Plaintiff's requests for gross revenues in determining that Plaintiff's conduct throughout this litigation was sufficiently egregious to warrant a finding that this case is exceptional. The requests were clearly meant as leverage to force Defendants to pony up a settlement offer independent of the value of the Patent or a license thereon. It was an obvious ruse and this Court should not condone the same.

**IV.   Plaintiff's Request for Defendants' Gross Revenues *Was* Frivolous**

**A.   Defendants' Gross Revenues Had No Nexus to Plaintiff's Claim**

Plaintiff suggests that its requests for Defendants' gross revenues were appropriate as relevant to the calculation of a reasonable royalty. (Opp. Br. at 9-10.) However, Plaintiff mischaracterizes the applicable law—provided only in a footnote—to reach this inane conclusion. (*See* Opp. Br. at 10 n.6.)

Specifically, Plaintiff relies on a 1970 case, *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), to support its contention that Defendants' gross revenues would have been relevant to determining a reasonable royalty.  However, though *Georgia-Pacific* does mention, as one consideration in determining a reasonable royalty, "[t]he established profitability of the product made under the patent," the case goes on to note that a reasonable royalty should also take into account "[t]he portion of the realizable profit that should be credited to the invention *as distinguished from non-patented elements*, . . ., business risks, *or significant features or improvements added* by the [alleged] infringer."  *Id.* at 1120 (emphases added).  Moreover, many subsequent cases have clarified that, to be relevant to a reasonable royalty calculation, an alleged infringer's revenues must be "carefully tie[d] . . . to the claimed invention's footprint in the market place.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010));[4] *see also Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("[W]here a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid . . . placing undue emphasis on the value of the entire product.").

The primary reason for Defendants' gross revenues at their concerts was the popular draw of Defendants as live performers, *not* the incidental use of  video screens used at their concerts.  Though Plaintiff makes much of the fact that numerous articles mentioned the video screens used at Defendants' concerts, (Opp. Br. at 10-12), *none* of these articles suggest that any concert-goers were motivated

---

[4] Defendants have already cited *Uniloc* when explaining why Plaintiff's request for gross revenues was improper, though Plaintiff conveniently ignores that.  (Defs.' Br. at 11.)

to attend because of these video screens rather than by the fame of the headliners and the live entertainment offered by Defendants.  Indeed, it strains reason to imagine that anyone paid for a Justin Timberlake (or Britney Spears) live concert ticket to view a video screen that was but a small physical component of the overall concert experience.[5]  It is perfectly clear that the gross revenues earned by Defendants have nothing to do with Plaintiff's "invention," thus these revenues could never have been relevant to calculating a reasonable royalty.

Therefore, Plaintiff's request for Defendants' gross revenues had no reasonable legal basis and instead evidences Plaintiff's overall strategy: attempting to leverage discovery to obtain personal and confidential information with the intent of securing a hefty settlement based on revenues that had nothing to do with Plaintiff's alleged "invention" and everything to do with Plaintiff's greed.

**B.   Defendants' Own Acknowledgment of Their High Net Worth Does Not Render Plaintiff's Request Permissible**

Plaintiff inexplicably finds it contradictory for Defendants to merely acknowledge their high net worth while protesting that Plaintiff's request for certified financial records was inappropriate.  (Opp. Br. at 8, 12-13.)  Defendants, particularly individual Defendants Spears and Timberlake, are indisputably entertainment superstars.  *See, e.g.*, Harriet Gibsone, *Being Britney: the Ups and Downs of a Pop Superstar*, The Guardian (May 14, 2015, 10:12 AM), http://www.theguardian.com/music/2015/may/14/being-britney-the-ups-and-downs-of-a-pop-superstar; *Entertainment Superstar Justin Timberlake To Make*

---

[5] Analogize to the incidental give-aways, at a concert, of hypothetical hats covered by a patent: it would be unrealistic to demand gross concert revenues as relevant to the issue of damages (even a reasonable royalty, even in settlement discussions) in a lawsuit alleging infringement of the patent for the hats.  This would remain so even if the hats were mentioned in concert reviews.

13

*Debut At American Century Championship*, PRNewswire (June 10, 2015),
http://www.prnewswire.com/news-releases/entertainment-superstar-justin-
timberlake-to-make-debut-at-american-century-championship-300097123.html.
Clearly, the fact that Defendants have a high net worth is not secret, but
acknowledging the same in a general statement does not require disclosure of any
sensitive financial information.

By contrast, Defendants understandably objected to Plaintiff's request for
certified gross concerts' receipts because that would have required disclosure of
***specific and highly sensitive*** financial information—which was in any case
entirely irrelevant, as discussed in Section IV.A., *supra*.  Though Defendants
directed Plaintiff to unverified third-party estimates of Defendants' gross revenues
to try to move the ball on realistic settlement discussions, this is not tantamount to
an acknowledgement that such estimates were relevant or correct.  Indeed, Plaintiff
must have understood the distinction between publicly-available estimates and
certified records, or else it would not have requested the latter.  Again, though,
there was no proper reason for Plaintiff to have requested these certified gross
revenue figures.  Plaintiff's "conduct" of settlement discussions was improper and
an egregious example of, *inter alia*, seeking to leverage disclosure of highly
sensitive information in an improper attempt to extort a settlement when the merits
did not warrant the same.

## V.      Defendants' Conduct Before the Patent Office Is Irrelevant But Was *Not* Improper

Plaintiff tries to justify its own egregious maintenance of its clearly invalid
Patent in the Courts and its misconduct before the U.S. Patent Office (discussed in
Section VI., *infra*) by suggesting, incorrectly, that it was instead Defendants that
misbehaved.  (Opp. Br. at 14-15.)  However, a summary of the relevant events

14

reveals that it was indeed Plaintiff that has acted egregiously before the Patent Office, not Defendants.

On April 17, 2012, Defendants submitted to the Patent Office a set of comments in which Defendants brought to the Patent Office's attention, for the first time, additional unequivocally-"published" prior art showing the use of a large, circular video screen during the 1996 Olympic Games (the "Olympics Prior Art"). (*See* Langsam 6/30 Decl., Ex. N, at 40-50.)[6]  Previously, the Petition for Reexamination had presented a live video feed (seen by tens of millions of NBC viewers) recorded on tape  and a commercial poster showing the circular video screens used at the opening ceremonies.  (*See* Langsam Decl., Ex. AA, at 12-13.) However, the Patent Office initially determined the video and poster to be inapplicable to the reexamination because the video was not "any printed publication" and it was "not clear whether the poster was privately printed or publicly available."  (*Id.* at 12, 13.)

In any case, on May 14, 2012, the Patent Office notified Defendants that their submission of the newly-presented Olympics Prior Art would not be considered as it did not satisfy the requirements of 37 CFR 1.948(a)(3).  (Burk Decl., Ex. 16, at 4.)  This entirely belies Plaintiff's allegation that Defendants "were permitted to present" the new Olympics Prior Art to the Patent Office.  (Opp. Br. at 14.).  Defendants tried but their submission was not accepted.

Moreover, contrary to Plaintiff's contention that Defendants "never re-submitted" the Olympics Prior Art, (Opp. Br. at 15), Defendants actually ***did re-***

---

[6] These comments were filed in conjunction with the Information Disclosure Statement to which Plaintiff's brief refers.  (*See* Opp. Br. at 15; Burk Decl., Ex. 17.)

*submit* their revised comments to the Patent Office on May 22, 2012.[7]  (Langsam Decl., Ex. BB.)  And, the next action by the Patent Office was the issuance of a non-final Action Closing Prosecution on July 27, 2012, which held every claim alleged by Plaintiff to be invalid because of the prior art).  (Langsam Decl., Ex. CC.)

It is also worth noting that, for all the noise that Plaintiff makes regarding the fact that the Patent Office found Defendants' submissions to be defective, two of Plaintiff's submissions were also held to be defective for procedural reasons.  (Langsam Decl., Ex. DD (re: Plaintiff's Nov. 25, 2013 brief); Ex. EE (re: Plaintiff's Dec. 16, 2013 brief).) .  And, of course, similarly, Plaintiff's submissions to this Court have been returned by the Clerk and then re-submitted.  (*See, e.g.*, dkt. 38, 81, 82, 207.)  That is not the basis, however, of Defendants' assertions of Plaintiff's egregious acts.

Finally, Plaintiff offers no factual support whatsoever for its repeated contention that expungement of a submission to the Patent Office is an "extraordinary" or even uncommon remedy.  (Opp. Br. at 14, 15.)  But, in any event, it is not Defendants' conduct under scrutiny, because every act taken by Defendants could have been avoided if only Plaintiff had recognized early on that all of its claims asserted to be infringed were so obviously overbroad and so easily shown to be invalid over the prior art on so many separate grounds.

---

[7] Aside from the fact that it is a ***patentee, like Plaintiff***, that owes the Patent Office a duty of candor and good faith in submitting prior art, Plaintiff's assertion that Defendants could have somehow breached that duty by ***repeatedly*** attempting to bring the Olympics Prior Art to the Patent Office's attention is bizarre and nonsensical.  (Opp. Br. at 15.)  Indeed, in its Decision on Appeal, the Patent Trial and Appeal Board did not consider the Olympics Prior Art because other prior art already clearly invalidated all of the claims.  (See Langsam 6/30 Decl., Ex. M, at 6.)

**VI.   Plaintiff's Conduct Before the Patent Office *Was* Egregious**

    **A.    Plaintiff Breached Its Duty of Candor and Good Faith**

Plaintiff breached its duty of candor and good faith by failing to immediately present to the Patent Office the Olympics Prior Art that Defendants provided to Plaintiff.  (*See* Defs.' Br. at 6-7; Section V., *supra*.)  As Plaintiff admits, the Patent Office declined to consider the Olympics Prior Art until it was submitted by Plaintiff.  (Opp. Br. at 15.)  Yet Plaintiff failed to provide this Prior Art to the Patent Office for ***months*** after Defendants brought it to Plaintiff's attention, then tried to sneak it into the file ***after*** the Patent Office had closed prosecution of the reexamination.  As a consequence of the late-submitted Olympics Prior Art, the reexamination was reopened, costing Defendants tens of thousands of dollars more. (*See* Langsam 6/30 Decl., Ex. J.)

    **B.    Plaintiff's Proposed Claim Constructions *Were* Ridiculous**

Despite cautioning that an attorneys' fees motion should not "'requir[e] a "mini-trial" on the merits,'"  (Opp. Br. at 2 (quoting *SFA Sys., LLC v. Newegg Inc.*, No. 2014-1712, 2015 U.S. App. LEXIS 11892, at *11 (Fed. Cir. July 10, 2015))), Plaintiff ignores that by launching into the substance of why its proposed claim constructions were not ridiculous.  (Opp. Br. at 15-18.)  However, the Court should not accept Plaintiff's weak attempts to justify its proposed claim constructions, ***all*** of which were rejected by the Patent Office, for some of the reasons that Defendants have already explained.  (*See* Defs.' Br. at 7-9.)  This Court is respectfully requested to review the Decision on Appeal (by a Patent Trial and Appeal Board comprised of three administrative judges), which clearly sets forth the disputed claim terms, Plaintiff's contentions as to what the terms meant, Defendants' proposed definitions, and the final determinations of the terms—every one of which was consistent with Defendant's definitions and none of which adopted the strained and nonsensical definitions put forth by Plaintiff.  (Langsam

6/30 Decl., Ex. M.)  The ultimately-adopted term definitions were not close calls at all; rather, Plaintiff's suggestions were egregious and plainly wrong.

That Defendants responded to Plaintiff's arguments in the reexamination does ***not*** mean that Plaintiff's arguments were not frivolous, as Plaintiff incredibly suggests.  (Opp. Br. at 19.)  Although a party is never required to respond to an opponent's arguments, whether frivolous or meritorious, Defendants would have been remiss to allow Plaintiff's ridiculous proposed claim constructions to go unchallenged.  Indeed, by Plaintiff's own warped reasoning, it should not have filed any opposition to Defendants' current motion for attorneys' fees, which Plaintiff now states is "frivolous."  (Opp. Br. at 23.)  Plaintiff's logic makes no sense at all.

## C.      Defendants Were Clearly the Prevailing Party in the Reexamination

Equally laughable but sadly requiring addressing is Plaintiff's suggestion that "Defendants cannot be properly referred to as the prevailing party in the reexamination." (Opp. Br. at 13.)  It bears repeating that ***every single one*** of the Patent claims that Defendants challenged—which, in turn, were ***all*** of the Patent claims that Plaintiff accused Defendants of infringing—were ***held to be invalid*** by the Patent Office on numerous occasions, by resort to various and many combinations of prior art and individual pieces of prior art.  (*See, e.g.*, Langsam 6/30 Decl., Ex. K, at 10-22; Ex. L, at 17-38; Ex. M, at 7-21.)  Although additional and new (and narrower in scope) claims of Plaintiff's Patent were ultimately found to be patentable, ***none of these additional claims were opposed*** by Defendants. (Opp. Br. at 13-14.)  Defendants had no incentive to oppose the validity of these additional Patent claims because Plaintiff is statutorily barred, under 35 U.S.C. § 252, from asserting any of the additional new claims against Defendants.  (*See*

dkt. 216 at 10-11.)  Defendants clearly prevailed before both the Patent Office and this Court.

If Plaintiff had really wanted to obtain new claims of patentable significance, the proper course of conduct would have been to disclaim or dedicate the original (now invalid) claims, release Defendants of the burden of participating in the reexamination and this litigation, and proceed on its own for new claims in a reexamination.  Plaintiff did not do this; instead, it consistently maintained that the original claims were valid (though not one was so determined) in an attempt to raise costs sufficiently to extract a settlement from Defendants.[8]

**VII.   Plaintiff's Commencement of This Case in the Eastern District of Texas *Was* Improper**

In arguing that its commencement of this action was acceptable, Plaintiff states that "LADS has existed continuously since its formation in 2009," two days before this action was commenced in the Eastern District of Texas ("E.D. Texas"). (Opp. Br. at 7.)  This assertion, though consistent with Plaintiff's pattern of distortion and misrepresentation, is clearly belied by the exhibit that Plaintiff itself submits in support of this "fact," namely, a Certificate of Filing that *reinstates LADS's existence as of July 20, 2015*.  (Burk Decl., Ex. 1.)  Clearly, Plaintiff had forgotten to maintain LADS's existence (due to an "oversight" that resulted in

---

[8] Plaintiff repeatedly (re-)submitted the same Patent claims to the Patent Office for consideration, despite the Patent Office's consistent rejection of the same from the very start.  Indeed, Plaintiff's resubmissions resulted in the Patent Office issuing no fewer than six lengthily-explained rejections, including a final Decision on Appeal, of the same (re-)submitted Patent Claims.  (*See* Langsam Decl., Ex. AA (Jan. 18, 2012, 48 pp.); Ex. FF (Jan. 18, 2012, 74 pp.); Ex. CC (July 27, 2012, 142 pp.); Langsam 6/30 Decl., Ex. K (Nov. 26, 2012, 164 pp.); Ex. L (May 14, 2013, 191 pp.); Ex. M (Nov. 3, 2014, 45 pp.).)

LADS not filing required tax returns for *3.5 years*) and reinstated the same only *after* learning, from Defendants' moving brief, that LADS no longer existed in Texas, nor anywhere else, as an entity.  (Opp. Br. at 7.)  Plaintiff is, typically, playing fast and loose with the truth.[9]

Plaintiff does not (presumably because it cannot) contest that LADS has never conducted any actual business in Texas, specifically, the E.D. Texas  (*See* Defs.' Br. at 2-3.)  Plaintiff merely states that "[t]here is nothing improper about creating an entity in the state of one's choosing"—a general proposition with which Defendants, naturally, do not disagree.  (Opp. Br. at 7.)  However, there *is* something improper and it is egregious to create an entity (namely, LADS) and to falsely assert in filed submissions to the courts that such an entity has been in business and is doing business in a jurisdiction exclusively for the purposes of *manufacturing* venue in a forum thought to be favorable for one's litigation position.  If this Court reviews the filings surrounding the Motion to Transfer from the E.D. Texas to this District, it is apparent that LADS never did any business in Texas, nor did it even obtain the keys to its "office," pick up its mail (which accumulated in the building's basement), and it was never present nor did business

---

[9] Plaintiff's allegation that Defendants "falsely assert[ed]," without qualification, that LADS's Patent was abandoned is also demonstrably incorrect and a distortion of the filings.  (Opp. Br. at 7.)  Specifically, Defendants stated the following:

> Indeed, as of June 30, 2015, neither LADS nor Metcalf had *timely* paid twelfth-year maintenance fees for the Patent, meaning that it has been abandoned (*unless a surcharge is paid, in addition to the maintenance fees, to continue the Patent's life*). ([Langsam Decl., ]Ex. D.)

(Defs.' Br. at 2 n.3 (emphases added).)  This is entirely consistent with Plaintiff's statements.

20

in its "offices" in Texas (as testified by the building's superintendent)—in spite of a staged photo submitted by Plaintiff to the contrary.  (Dkt. 46, 61.)  This, too, was clearly egregious conduct.

Moreover, Defendants' choice not to seek dismissal of this action based on personal jurisdictional defects was tactical and a means to avoid unnecessary expenditure of attorneys' time, fees, and judicial resources.  Defendants reasonably believed that Plaintiff would have simply re-filed the action anyway, so Defendants decided to properly seek a change of venue instead.

Plaintiff defends its choice of the E.D. Texas as a forum for this action in large part on the ground that two defendants, Steve Dixon and his company Music Tour Management, Inc. ("MTM"), were based in Texas.  (Opp. Br. at 6.)  Yet ***Mr. Dixon submitted an affidavit in support of Defendants' motion to transfer venue*** to the Central District of California.  (Dkt. 46-8.)  Thus, Plaintiff's argument that the presence of Mr. Dixon and his entity in Texas made the E.D. Texas the appropriate location for this lawsuit is tenuous at best—especially since Mr. Dixon and MTM were not added as defendants until ***after*** Defendants first moved the court to transfer venue.  (*See* dkt. 55 (Plaintiff's motion to amend Complaint to add defendants Mr. Dixon and MTM); dkt. 46 (Defendants' motion to transfer venue).)

For the many reasons already brought to the Court's attention, Plaintiff's commencement of this action in the E.D. Texas was objectionable on myriad grounds.  (*See* Defs.' Br. at 1-4; dkt. 46.)  The manufacture of acts of alleged infringement within the jurisdiction (e.g., purchases of tickets to remote concerts and of videos of a concert in New York) and Plaintiff's assertion of venue were among the first, though nowhere near the last, instances of Plaintiff's egregious litigation misconduct.

## VIII.  Plaintiff Did *Not* Make Good Faith Effort to Cooperate With Defendants

Plaintiff, incredibly, asserts that it "went above and beyond its duty in seeking to cooperate with Defendants and reduce [] attorneys' fees and expenses." (Opp. Br. at 21.)  In support of this assertion, Plaintiff adduces two examples of its supposed "Good-Faith Efforts to Cooperate": one is Plaintiff's granting Defendants an additional three months to file an answer,[10] and the other is agreeing to postpone depositions pending a ruling on Defendants' motion for a stay (which Plaintiff strenuously opposed).  (Opp. Br. at 21.)  (A third example of good conduct relates to the Los Angeles Lakers, who settled out of this case years ago and thus have nothing to do with the instant motion.)  Considering that extensions for filing an Answer are routinely granted and the depositions would have anyway been postponed by the granted stay, it stretches credulity to conclude that Plaintiff went "above and beyond"—or even directly there.  Reliance on that "cooperation" hardly outbalances the egregious conduct referred to for justifying an award of attorneys' fees.  The two isolated instances in which Plaintiff did not behave in a despicable manner do not somehow immunize the rest of Plaintiff's demonstrably egregious behavior.

## IX.  Defendants' Requested Attorneys' Fees Are Entirely Reasonable

For the detailed reasons set forth in Defendants' moving brief and the Langsam Declaration submitted in support thereof, Defendants' requested attorneys' fees are entirely reasonable.  (Defs.' Br. at 16-19; Langsam 6/30 Decl., ¶¶ 26-48.)  Moreover, because Plaintiff's litigation misconduct commenced at this action's inception, continued through transfer to this District, the motion for a stay,

---

[10] Plaintiff seems to take particular pride in agreeing to extend Defendants' answer deadline, discussing this fact twice in its brief.  (Opp. Br. at 9, 21.)

the entire and exhaustive reexamination before the U.S. Patent Office, and persisted through even Plaintiff's most recent motion to this Court for additional discovery to levy previously-unasserted claims, Defendants are entitled to recover **all** of their attorneys' fees, costs, and expenses.  (*See* Defs.' Br. 15-16; *contra* Opp. Br. at 23.)

However, if the Court deems it necessary to hold a separate hearing to determine the proper amount of attorneys' fees, costs, and expenses to which Defendants are entitled, the Defendants will gladly participate.

## CONCLUSION

For the reasons set forth herein and in Defendants' moving brief, Defendants respectfully request that the Court grant their motion and award them attorneys' fees, costs, and expenses, in full, along with any other relief, pre- and/or post-judgment interest, etc. that it deems appropriate.

**PRYOR CASHMAN LLP**

Dated: August 3, 2015        By:     */s/ Michael J. Niborski*

Michael J. Niborski

Andrew S. Langsam (admitted *pro hac vice*)

***Attorneys for Defendants***

Tennman Productions, LLC; Justin

Timberlake; Spears King Pole, Inc.; and

Britney Spears

23